# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
December 8, 2004 Session

## CAROLYN MARIE LEASURE WHITE, ET AL. v. TIMOTHY WADE MOODY

**Appeal from the Chancery Court for Robertson County**
**No. 14201     Carol A. Catalano, Chancellor**

---

**No. M2004-01295-COA-R3-PT- Filed December 30, 2004**

---

This is the third appeal of a case involving a divorced father's parental rights to his eleven-year-old daughter. The father maintained only sporadic contact with his daughter following his divorce from the child's mother. After the child's mother remarried, she and her new husband filed a petition in the Chancery Court for Robertson County seeking to terminate the father's parental rights and to permit the mother's new husband to adopt the child. We reversed the first order terminating the father's parental rights because the trial court had failed to conduct the statutorily required best interests analysis. On remand, the trial court determined that terminating the father's parental rights was in the child's best interests without conducting an evidentiary hearing. We reversed the second termination order and remanded the case to enable the parties to present evidence. Following an evidentiary hearing, the trial court entered a third order terminating the father's parental rights and granting the stepfather's petition to adopt the child. The father has appealed the trial court's conclusion that terminating his parental rights is in his daughter's best interests. We have determined that the record contains clear and convincing evidence to support the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

Wende J. Rutherford, Nashville, Tennessee and Charlotte U. Fleming, Springfield, Tennessee, for the appellant, Timothy Wade Moody.

Frank E. Mondelli, Nashville, Tennessee, for the appellees, Carolyn Marie Leasure White and Robert Wayne White.

## OPINION

## I.

On June 11, 1992, Carolyn Marie Leasure White and Timothy Wade Moody wed in Virginia Beach, Virginia. Ms. White was only eighteen years old, and Mr. Moody was twenty. When they

separated four months later, Ms. White returned to her parents' home in Virginia Beach, and Mr. Moody went to live with his parents in Texas. Ms. White was pregnant when the parties separated, and in June 1993, she gave birth to Nicole Lyn Leasure-Moody.[1] In August 1994, Ms. White and Mr. Moody were divorced in the Circuit Court for the City of Virginia Beach, and one month later, Ms. White married Robert Wayne White.

The Virginia divorce decree granted Ms. White and Mr. Moody joint custody of their daughter. Ms. White was designated as the primary residential parent, and Mr. Moody was granted visitation rights consisting of one week of daytime visitation each year at his home in Texas, as well as full and unlimited daytime visitation in Virginia Beach at his expense and after forty-eight hours notice to Ms. White. The decree also required Mr. Moody to pay Ms. White $305 per month in child support.

During the first few years following Nicole's birth, Mr. Moody took reasonable advantage of this visitation rights. Even though he continued to reside in Texas, he traveled to Virginia Beach to visit Nicole shortly after she was born, and he returned again in December 1993. He made several telephone calls during 1993 and paid his child support regularly. In 1994, he visited Nicole several times and continued making telephone calls, although the calls were relatively short because of Nicole's age. Mr. Moody visited Nicole twice in 1995 and continued to make his regular child support payments; however, the number of his telephone calls decreased. In addition to his visits and telephone calls during this time, Mr. Moody sent Nicole Christmas and birthday presents, although these presents frequently arrived late and oftentimes did not include a card or a note.

Sometime around November 1995, Ms. White, her husband, Nicole, and their two other children moved to Springfield, Tennessee. Because Mr. Moody was not actively part of Nicole's everyday life, Mr. White gladly took on many parenting responsibilities, including changing diapers, taking care of Nicole when she was ill, and nurturing and caring for her. As time passed, Nicole came to consider Mr. White as her father and the Whites' two children as her siblings.

Problems with Mr. Moody's relationship with Nicole began to surface in 1996. Mr. Moody was suffering from bipolar disorder. He did not visit Nicole in Tennessee that year, although he continued to call and to send gifts. He paid his child support sporadically because he was having difficulty maintaining employment. As the year went on, Ms. White and her husband became increasingly concerned about Mr. Moody's relationship with Nicole. For his part, Mr. White became increasingly interested in adopting Nicole.

As Mr. Moody's visits with Nicole became less frequent, so did his telephone calls. Nicole went from December 1996 through March 1997 without hearing anything from Mr. Moody. Accordingly, in early 1997, the Whites filed a petition to terminate Mr. Moody's parental rights.[2] When Mr. Moody heard about the petition, he begged Ms. White to withdraw it and promised that

---

[1] It is now our custom to use pseudonymous designations for the parents and children in cases of this sort. We have not followed that convention in this case because we have already rendered two opinions using the parties' names.

[2] Although the Whites state that they visited a lawyer and arranged for the petition to be filed, there is some confusion in the record as to whether this petition was actually ever filed.

he would resume paying his child support and contacting Nicole regularly. The Whites reluctantly withdrew the termination petition after Mr. Moody resumed telephoning Nicole. However, this was short-lived. From June 1997 until October 1998, the only contact Mr. Moody had with Nicole was one telephone call and one card. He stopped paying his child support regularly, and at one point, made no child support payments for ten months.

On October 7, 1998, the Whites filed a petition in the Chancery Court for Robertson County again seeking to terminate Mr. Moody's parental rights and to permit Mr. White to adopt Nicole. This petition prompted Mr. Moody to resume his attempts to contact Nicole in 1999. In May 1999, after the Whites' lawyer informed Mr. Moody that he could no longer visit with Nicole, Mr. Moody requested the trial court to enforce the visitation provisions in the parties' divorce decree. During June 1999, Mr. Moody talked with Nicole by telephone once and also had a visitation with her -- his first personal visitation since July 1995.

Following a hearing on July 8, 1999,[3] the trial court filed an order on August 5, 1999, denying Mr. Moody's request for visitation, as well as suspending all further visitation until the final hearing on the Whites' termination and adoption petitions.[4] Mr. Moody's failure to pay child support or to contact Nicole for approximately sixteen months weighed heavily on the trial court's mind. Despite its awareness that Mr. Moody had been twice hospitalized with depression, the trial court concluded that his past behavior was inexcusable.

On March 9, 2000, the trial court conducted the first hearing on the Whites' termination and adoption petitions. The court concluded that Mr. Moody had abandoned Nicole and that Mr. White had such a close relationship with Nicole that she considered him to be her father. Accordingly, in June 2000, the court entered an order terminating Mr. Moody's rights, finding him in civil contempt for failure to pay child support, and granting Mr. White's adoption petition. Mr. Moody appealed the decision to this court. By this time, Mr. Moody had been diagnosed with bipolar disorder. He was being treated by a physician and was receiving medication through the Department of Veterans Affairs.

On May 18, 2001, this court filed an opinion affirming the trial court's conclusion that Mr. Moody had abandoned Nicole but vacating the portions of the order terminating Mr. Moody's parental rights and permitting Mr. White to adopt Nicole. We noted that the trial court had failed to make a specific finding that terminating Mr. Moody's parental rights was in Nicole's best interests.[5] Accordingly, we remanded the case to the trial court with directions to conduct a hearing regarding whether terminating Mr. Moody's parental rights was in Nicole's best interests.

---

[3]The appellate record does not include a transcript of the July 8, 1999 hearing, although it does contain the exhibits filed with the court during that hearing.

[4]The trial court may have allowed Mr. Moody some limited telephone contact with Nicole.

[5] *White v. Moody*, No. M2000-01778-COA-R3-CV, 2001 WL 537160, at *1 (Tenn. Ct. App. May 18, 2001) (No Tenn. R. App. P. 11 application filed).

The trial court conducted two days of hearings in November 2001 and March 2002 to determine whether terminating Mr. Moody's parental rights was in Nicole's best interests. During this hearing, the trial court limited its consideration to the original record and declined to permit the parties to introduce new evidence regarding events occurring after March 2000. Ultimately, in April 2002, the trial court entered a second order concluding that terminating Mr. Moody's parental rights was in Nicole's best interests. Mr. Moody appealed again. On July 25, 2003, we again vacated the judgment terminating Mr. Moody's parental rights after concluding that the parties should have been permitted to present evidence regarding Nicole's best interests.[6]

In September 2003, Mr. Moody requested the trial court's approval for in-person visitation with Nicole. On November 19, 2003, the trial court filed an order denying visitation because Mr. Moody had not had in-person visitation since 1999. By the time of the February 12, 2004 hearing, Mr. Moody was steadily employed at a meat packing plant in Booneville, Arkansas where he was earning $10.50 per hour. He and his fiancée had established a stable home and were planning to be married, and Mr. Moody enjoyed a good relationship with his fiancée's two daughters.

On April 7, 2004, the trial court entered its third order terminating Mr. Moody's parental rights and approving Mr. White's adoption of Nicole. The trial court relied heavily on the testimony of Dr. Jay Woodman, a clinical psychologist who evaluated Nicole. Dr. Woodman had concluded (1) that Nicole did not have any connection with Mr. Moody, (2) that Mr. Moody had frequently violated Nicole's trust by breaking promises to telephone her or to send her presents, and (3) that Mr. Moody's conduct upset Nicole. However, on April 14, 2004, the trial court entered an order permitting Mr. Moody to continue making telephone and mail contact with Nicole pending appeal. On September 15, 2004, the trial court entered an order granting Ms. White a $4,480 judgment against Mr. Moody for his child support arrearage. Mr. Moody has again appealed to this court.

## II.
### THE TRIAL COURT'S COMPLIANCE WITH TENN. CODE ANN. § 36-1-113(k) (SUPP. 2004)

At the outset, Mr. Moody takes issue with the trial court's failure to file written findings of fact and conclusions of law within thirty days of the hearing as required by Tenn. Code Ann. § 36-1-113(k). The Whites, apparently believing that this issue is a trivial technicality, have ignored it in their brief. We, however, view compliance with the explicit requirements regarding written findings of fact and conclusions of law in termination cases with great seriousness. Even though there is no question that the trial court failed to comply with Tenn. Code Ann. § 36-1-113(k), we have determined that this case should not be remanded for the entry of written findings of fact and conclusions of law because of the inordinate delay that has already occurred in the final disposition of this case.

For the past four years, this court has repeatedly called the plain, mandatory requirements of Tenn. Code Ann. § 36-1-113(k) to the attention of the trial courts. Unlike ordinary civil proceedings, trial courts must enter written findings of fact and conclusions of law in termination cases within

---

[6]*White v. Moody*, No. M2002-01287-COA-R3-CV, 2003 WL 21730761, at *2 (Tenn. Ct. App. July 25, 2003) (No Tenn. R. App. P. 11 application filed).

-4-

thirty days following the conclusion of the termination hearing. We have cautioned the trial courts against simply making oral findings of fact from the bench and then directing that they be incorporated in the final order. *See, e.g., In re S.M.*, ___ S.W.3d ___, ___n.12, 2004 WL 66685, at *3 n.12 (Tenn. Ct. App. Jan. 15, 2004). We have likewise pointed out that failure to comply with Tenn. Code Ann. § 36-1-113(k) may necessitate remanding the case with directions to prepare written findings of fact and conclusions of law. *See e.g.*, *In re M.J.B.*, 140 S.W.3d 643, 653-54 (Tenn. Ct. App. 2004).

In this case, the trial court made oral findings from the bench at the conclusion of the February 12, 2004 hearing. However, it did not enter a final order until April 7, 2004, and this order contained neither findings of fact nor conclusions of law. It simply recites that "it is in the best interest and welfare of the minor child for the Respondent's parental rights [to] be terminated and that the step-father be allowed to adopt the minor child." Accordingly, no conclusion can be drawn other than the trial court has not complied with Tenn. Code Ann. § 36-1-113(k).

In most circumstances, the appropriate remedy for the trial court's oversight would be to vacate the judgment terminating Mr. Moody's parental rights and granting Mr. White's adoption petition and remand the case to the trial court with directions to file written findings of fact and conclusions of law in accordance with Tenn. Code Ann. § 36-1-113(k). However, we have already been required to remand this case twice. These remands have delayed the final resolution of this case by approximately three years. Incurring further delay by remanding this case a third time will not serve the interests of any of the persons who have been enmeshed in this litigation for seven long years. Accordingly, rather than remanding the case as we would customarily do, we will address the substantive merits of the trial court's conclusion that terminating Mr. Moody's parental rights at this time is in Nicole's best interests using the trial court's oral findings of fact.

## III.
### THE BEST INTERESTS OF THE CHILD

Appeals from orders terminating parental rights customarily present two issues. The first issue is whether grounds exist for terminating a parent's parental rights. If the answer to this issue is yes, then the second issue is whether terminating the parental rights is in the child's best interests. We are not required here to consider whether grounds exist for terminating Mr. Moody's parental rights because that issue has already been decided against him on the first appeal when we concluded that the record contained clear and convincing evidence that he had abandoned Nicole. *White v. Moody*, 2001 WL 537160, at *1. Mr. Moody did not appeal from that decision, and it has now become the law of the case. Accordingly, the only issue now before us is whether terminating Mr. Moody's parental rights to Nicole is in Nicole's best interests.

### A.

The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests. However, as important as these interests are, they do not dominate every phase of a termination of parental rights proceeding. The best interests of the child do not become the paramount consideration until the trial court has determined that the parent is

-5-

unfit based on clear and convincing evidence of one or more of the grounds in Tenn. Code Ann. § 36-1-113(g) (Supp. 2004). Once a parent has been found to be unfit, the interests of the parent and the child diverge. While the parent's interests do not evaporate upon a finding of unfitness, *Santoski v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394-95 (1982), the focus of the proceedings shifts to the best interests of the child.

While a finding of parental unfitness is a necessary prerequisite to terminate a parent's rights, a finding of unfitness does not necessarily require that the parent's rights be terminated. *In re Termination of Parental Rights of Alexander V.*, 678 N.W.2d 856, 863 (Wis. 2004). Not all parental misconduct is irredeemable. Thus, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests.

The concept of the child's best interests evolved in the context of divorce proceedings and has now migrated from legal discourse into popular culture. What is best for children depends on values and norms upon which reasonable persons can differ. *Rideout v. Riendeau*, 761 A.2d 291, 296 n.5 (Me. 2000). Thus, critics of the best interests of the child standard often point out that its non-specificity leads to unpredictable and inconsistent outcomes. *Troxel v. Granville*, 530 U.S. 57, 101, 120 S. Ct. 2054, 2079 (2000) (Kennedy, J., dissenting); American Law Institute, *Principles of the Law of Family Dissolution* 2 & n.2 (Tentative Draft No. 3, Mar. 3, 1998); Julie E. Artis, *Judging The Best Interests of the Child: Judges' Accounts of the Tender Years Doctrine*, 38 Law & Soc'y Rev. 769, 774-75 (2004). However, others have pointed out that the courts' persistent reliance on the best interests of the child standard suggests that no more appealing formulation is likely to be offered and that it is not much less workable than other standards the law has adopted. 2 HOMER H. CLARK, THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 20.4, at 495 (2d ed. 1987) ("THE LAW OF DOMESTIC RELATIONS").[7]

Professor Clark, the author of one of the seminal domestic relations treatises, has observed that "few if any experienced judges and lawyers think that . . . [the child's best interests standard] goes very far toward deciding cases. That can only be done by considering the facts of the individual case against the background of factors held to be relevant in earlier cases." THE LAW OF DOMESTIC RELATIONS § 20.6, at 479. In recent years, the Tennessee General Assembly, like other state legislatures, has undertaken to codify the factors that courts should consider when called upon to ascertain a child's best interests in various circumstances. In termination of parental rights cases such as this one, the General Assembly has provided the courts with a non-exclusive list of nine factors to consider. Tenn. Code Ann. § 36-1-113(i) (Supp. 2004).[8] Thus, ascertaining a child's best

---

[7]The courts in forty-nine states and the District of Columbia have been charged by statute to use the best interests of the child standard when it comes to custody determinations. Naomi R. Chan, *Reframing Child Custody Decisionmaking*, 58 Ohio St. L.J. 1, 9-14 (1997).

[8]The Tennessee General Assembly has devised different sets of factors to guide the court's consideration of the child's best interests in other contexts. *See, e.g.*, Tenn. Code Ann. § 36-6-106(a) (2001) (divorce and other proceedings); Tenn. Code Ann. § 36-6-108(c) (2001) (parental relocation); Tenn. Code Ann. § 36-6-307 (2001) (grandparent visitation); Tenn. Code Ann. § 36-6-404(b) (Supp. 2004) (parenting plans).

interests in a termination proceeding is a fact-intensive inquiry[9] requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective. *In re Hammett*, No. 245221, 2003 WL 22416515, at *2 Mich. Ct. App. Oct. 23, 2003); *In re L.N., Jr.*, ___ N.W.2d ___, ___, 2004 WL 2785206, at *2 (S.D. Dec. 1, 2004); *In re Marriage of Pape*, 989 P.2d 1120, 1130 (Wash. 1999).

### B.

Ascertaining a child's best interests in cases of this sort does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

We have here an eleven-year-old child who has had extremely limited interaction with her father during her formative years. This lack of interaction can be attributed to four things: (1) her parents' separation and eventual divorce, (2) the geographical distance between her home and her father's home, (3) her father's own psychological struggles, and (4) the legal barriers erected by the trial court beginning in August 1999. From the child's point of view, the reasons for the lack of interaction matter little. What matters is that she feels no connection with her father.

What matters also is that during the past nine years the child has not longed for a relationship with her father because that void has been filled by her stepfather. She has a developed a strong attachment to Mr. White resulting from the day-to-day attention he has paid to her physical care, nourishment, comfort, affection, and stimulation. Mr. White has been Nicole's de facto parent ever since late 1995, so much so that she refers to him as her "father" and to Mr. Moody as her "father in Texas."

During the seven years since the Whites filed their petition to terminate Mr. Moody's parental rights, Mr. Moody has made strides in bringing order to his personal life. He has sought treatment for his bipolar disorder and, with this illness in check, has restored balance to his life. He is steadily employed and has developed a healthy relationship with his fiancée and her children. He has also attempted, to the best of his ability, to reconnect with Nicole. Unfortunately, he has been unable to mitigate the fact that the passage of time has made him a stranger to his daughter.

---

[9] In another context, we have noted that "[t]he 'best interests' analysis is broad and subjective. It does not employ hard and fast rules and is largely fact-dependent. The Tennessee Supreme Court has candidly noted that the 'best interests' analysis cannot provide perfect solutions to custody and visitation disputes." *Yeager v. Yeager*, No. 01A01-9502-CV-00029, 1995 WL 422470, at *4 (Tenn. Ct. App. July. 19, 1995) (No Tenn. R. App. P. 11 application filed) (citations omitted).

As the circumstances existed at the February 2004 hearing, Nicole had no connection with Mr. Moody. They have not seen each other for almost five years. Their infrequent, relatively brief telephone conversations lack substance, depth, or warmth. Mr. Moody is simply not a part of Nicole's life. She rarely expresses an interest in seeing him and, in fact, expresses tearful concern at the prospect of being required to visit with him. Based on these circumstances, Nicole should, in the words of Dr. Woodman, be permitted to "move ahead" with her life without Mr. Moody. Thus, viewing the evidence from Nicole's point of view, terminating Mr. Moody's parental rights is clearly in her best interests.

Accordingly, we conclude that the record contains clear and convincing evidence supporting the trial court's conclusion that terminating Mr. Moody's parental rights at this time is in Nicole's best interests. Having upheld the termination of Mr. Moody's parental rights, we likewise affirm the trial court's decision to permit Mr. White to adopt Nicole.

## IV.
### MR. MOODY'S OBLIGATION FOR THE CHILD SUPPORT ARREARAGE

As a final matter, Mr. Moody insists that he is entitled to receive a credit against the judgment for his child support arrearage for all the child support he paid "during the pendency of the appellate process." As we understand his reasoning, he believes that he would not have been obligated to pay this child support had his parental rights been terminated earlier and now that his parental rights have been terminated, he is entitled to receive this money back in the form of a credit against the $4,480 judgment against him and a refund of all money over and above that amount.

Mr. Moody's brief discusses this argument briefly and in a very cursory fashion. We do not understand him to be arguing that he was somehow forced to pay child support during the periods from June 2000 through May 2001 or April 2002 through July 2003 when his parental rights had been terminated. Accordingly, his argument focuses on child support payments he made between June 2000 and February 2004 during the times when his parental rights were not terminated and he was obligated to provide financial support for his child. We know of no legal or equitable principle that excuses him from this obligation. Accordingly, we affirm the $4,480 judgment against him. However, we also note that because we have affirmed the April 7, 2004 order terminating Mr. Moody's parental rights, his obligation to support Nicole financially ended as of the date of that order.

## V.

We affirm the judgments of April 7, 2004 and September 15, 2004 and remand the case to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal to Timothy Wade Moody and his surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.

-8-