In re The ADOPTION OF D.P.E.

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

June 17, 2008 Session.

July 3, 2008.

Application for Permission to Appeal
Denied by Supreme Court
Sept. 29, 2008.

Charles Dungan, Maryville, Tennessee, for the Appellant, M.L.P.E.

Theodore Kern, Knoxville, Tennessee, for the Appellees, R.S. and S.S.

Robert A. Cole, Knoxville, Tennessee, Guardian ad Litem for D.P.E.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

R.S. and S.S. ("Petitioners") are the foster parents of D.P.E. (the "Child"), who has been in their care since June of 2003. Petitioners filed a petition seeking to terminate the parental rights of M.L.P.E. ("Mother") and J.P.E. ("Father") and to adopt the Child. Father eventually surrendered his parental rights, but Mother contested the petition. Following a trial, the Trial Court terminated Mother's parental rights after finding clear and convincing evidence that grounds existed to terminate her parental rights, and that such termination was in the best interest of the Child. We reversed the Trial Court's judgment after finding the Trial

Court erred when it failed to appoint a guardian ad litem on the Child's behalf. On remand, a guardian ad litem was appointed and a second trial was held. At the second trial, the parties stipulated that grounds existed to terminate Mother's parental rights. The sole issue in the second trial was whether there was clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest. The Trial Court found that Petitioners had presented clear and convincing evidence and entered a final judgment terminating Mother's parental rights. The sole issue on appeal is whether the Trial Court erred in finding there was clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest. We affirm the judgment of the Trial Court.

### Background

This is the second occasion this Court has had to consider the propriety of the Trial Court's order terminating Mother's parental rights to the Child who was born in November of 2002. The sole issue decided by this Court in the first appeal was whether the Trial Court had erred by not appointing a guardian ad litem on the Child's behalf even if none of the parties requested such an appointment. Our first opinion also set forth some background information. We stated:

> This is a parental termination case. Before trial, the trial court inquired if the parties wanted a guardian ad litem appointed to represent the interests of the minor child. The parties indicated that no guardian ad litem was needed. After a contested hearing, the trial court terminated the parental rights of both parents. The sole issue we address in this appeal is whether the trial court was required to appoint a guardian ad litem for the child when the parties did not request the appointment of one. Af-

ter careful review, it is our determination that because this was a contested parental termination proceeding, the trial court was required to appoint a guardian ad litem for the minor child pursuant to Tenn. S.Ct. R. 13 § 1(d) 2(D). This was not a matter that could be waived by the parties. Therefore, we vacate the judgment of the trial court and remand for appointment of a guardian ad litem and a trial on the merits.

## I. Factual and Procedural Background

A little over one month after D.P.E.'s birth on November 15, [2002], the State of Tennessee, Department of Children's Services ("DCS") removed him from the custody of his biological parents, M.L.P.E. ("Mother") and J.P.E. ("Father"). The removal was because the Knox County Juvenile Court had entered a decree on January 23, 2002, finding by clear and convincing evidence that Father had committed severe child abuse by use of force against D.P.E.'s sibling and that Mother had committed severe child abuse "by her gross failure to protect the child."

Later, the juvenile court entered an order finding D.P.E. to be dependent and neglected and placing him in the temporary custody of DCS. In June of 2003, he was placed in the foster care of [R.S. and S.S.], and a year later, [R.S. and S.S.] filed a petition in the Knox County Chancery Court to terminate the parental rights of Mother and Father. The petition was contested by Mother, Father, and DCS. Prior to trial, all parties agreed that the appointment of a guardian ad litem on behalf of D.P.E. was not necessary, and none was appointed.

At trial, Mother and Father conceded that the juvenile court's finding of severe child abuse by them against

D.P.E.'s sibling was *res judicata* and, accordingly, it was not disputed that grounds existed for termination of their parental rights pursuant to T.C.A. § 36–1–113(g)(4). Mother and Father did, however, dispute that termination of parental rights was in D.P.E.'s best interest, and the case was tried upon that issue. At the conclusion of trial, the trial court terminated Mother and Father's parental rights upon finding, by clear and convincing evidence, that statutory grounds existed for termination and that termination was in the best interest of D.P.E. Mother and DCS now appeal.

## II. Issue Presented

Mother and DCS argue on appeal that it was not shown by clear and convincing evidence that termination was in the child's best interest and therefore the trial court's decision to terminate Mother's parental rights was in error. DCS asserts the additional ground that the trial court erred by not appointing a guardian ad litem for the minor child. The sole issue we address is the issue raised by DCS-whether the trial court erred in not appointing a guardian ad litem for the child.

*In re Adoption of D.P.E.*, No. E2005–02865–COA–R3–PT, 2006 WL 2417578, at *1 (Tenn.Ct.App. Aug.22, 2006) (footnotes omitted).

As set forth above, we concluded in the first appeal that the Trial Court had erred when it failed to appoint a guardian ad litem on the Child's behalf.[1] We, therefore, vacated the Trial Court's judgment and remanded the case to the Trial Court for appointment of a guardian ad litem and a new trial. *Id.*, at *3.

On remand, a guardian ad litem was appointed and a new trial conducted.[2] As with the first trial, at the second trial Mother did not contest that grounds for terminating her parental rights existed and the sole issue was whether there was clear and convincing evidence that terminating her parental rights was in the Child's best interest.

The first witness was S.S., the Child's foster mother and prospective adoptive mother. S.S. testified that she and her husband, R.S., have been married for nine years. Petitioners live in a three bedroom house. Petitioners do not have any children together, although S.S. has adult children who no longer live in her home. S.S. is a registered nurse and works full-time. Petitioners became the Child's foster parents in June of 2003. The Child currently attends pre-school and in the summer attends a summer day camp program that has various activities. Petitioners and the child attend church on Sundays and the Child participates in church-related activities. According to S.S., the Child refers to her and R.S. as "mommy" and "daddy." The Child refers to Mother as "Kirsten's mommy."[3]

S.S. testified that Mother's visitation with the Child was sporadic at first. Mother's visitation later was increased to every other week and then every week until after the first trial. S.S. described

---

1. As noted in our Opinion in the first appeal, during the first trial Father withdrew his opposition to the petition to terminate his parental rights. Father currently is serving a thirteen year prison sentence for the aggravated child abuse committed upon the Child's older sibling, and he has voluntarily surrendered his parental rights to the Child.

2. Following remand, this case was transferred to a different Chancellor.

3. Kirsten is Mother's third child and the Child's younger half-sister.

the problems that were encountered when the Child visited with Mother. S.S. stated that the Child was speaking clearly until he would have visits with Mother. After the visitation, the Child stuttered so badly that S.S. had trouble understanding him. The Child would stutter for several days and then his speech would return to normal, at least until the next visitation when the stuttering would start again. The stuttering continued until visitations with Mother ceased. S.S. testified that she also experienced difficulties with the visitations disrupting the Child's potty training and sleep pattern. As with the stuttering, these problems ceased when the visitations with Mother ended. Because of the difficulties the Child was experiencing, S.S. had the Child evaluated by Dr. Peter Young, a psychologist.

S.S. explained that the Child has met many of her and her husband's family members at various family functions over the years. S.S. described the Child as being a "big part of everybody in my family." When asked what she wanted for the Child, S.S. stated:

> I want what is going to be the best for [the Child] and he is going to grow up in a safe and stable environment and have a chance to grow up to be a healthy and happy adult.

S.S. added that she was prepared to make her best effort to see that happen.

According to S.S., before the petition to adopt was filed and soon after Mother began visitations, S.S. talked with Mother and told her that it would be an easier transition for the Child if S.S., R.S., and Mother got along. S.S. stated that Mother "basically told me no."

The next witness was R.S., who is employed with the Knox County Library System. R.S. works in the department responsible for maintaining the computer system. R.S.'s testimony was consistent with that of S.S. regarding how they have integrated the Child into their lives and include him in family activities, church-related functions, etc. R.S.'s testimony also was consistent with S.S.'s testimony regarding how the Child's visitation with Mother negatively impacted his behavior once he returned from the visitation.

Dr. Peter Young was called as a witness for Petitioners. Dr. Young is a licensed clinical psychologist and was tendered as an expert witness with no objections as to his qualifications. Dr. Young reviewed, among other things, copies of reports made by staff members of Parent Place, which is where Mother's visitations took place following the first trial. While Dr. Young observed that generally the visitations went well, the staff members felt that something was "amiss" even though they could not state exactly what that was.

Dr. Young stated that Petitioners cared "consistently and well" for the Child. The Child has bonded well with Petitioners. The Child views Petitioners as his mom and dad, and Dr. Young did not observe any difficulties between the Child and Petitioners. According to Dr. Young:

> [The Child] feels that [Petitioners] are mom and dad, and I think it's clear that that is what they hope would legally come to pass. I read over my previous report, and in that report I made clear, and I still think it's clear, that particularly with [S.S.], she wants what is in the best interest of this boy. I think now she is fairly convinced that what is in the best interest is for him to stay in their home. So, you know, you can say her perspective is biased, but I concur with that impression.

* * *

> One of the things that's been noted, not just by [Petitioners], but by his teacher at school, on days following vis-

its with biological mom, he tends not to do as well, he tends to be less appropriate in school and is more restless and rambunctious. And [S.S.] also reports that following those visits he goes to bed early and sleeps long, so seemingly he is exhausted or overly tired. It seems from everything I hear that it's a stressful kind of situation for him . . . .

Dr. Young added that the Child's stuttering after visits with Mother is the result of anxiety and tension from those visits.

Dr. Young explained that the Child would feel like he had lost both of his parents if the Child was removed from Petitioners' home, and that this removal would be traumatic for the Child. According to Dr. Young:

A. At this point, given the period of time that he's been with [Petitioners] and the attachment he has [to them], I think it would be very difficult [for him if he was removed from Petitioners' care].

Q. What is your understanding of the reason for this hearing today?

A. My understanding is that we are here to try to decide what is in [the Child's] best interest. Other questions that are a part of the picture are not the focus. The focus in what is in his best interest.

Q. Do you have an opinion as to what is in [the Child's] best interest?

A. Yes, it basically is stay with [Petitioners].

Q. Why do you express that opinion?

A. Again they have been the primary caregivers for the majority of his life, they have consistently provided him what he needed, they clearly love him and he clearly loves them.

Although Dr. Young candidly acknowledged that there was no way to be certain about how disruptive a change of caregivers would be on the Child, he nevertheless opined that it would be a "significant disruption" to the Child's developmental process.

Dr. Young performed psychological evaluations on both S.S. and R.S. Dr. Young did not believe that either of them were in any need of any mental health treatment. Dr. Young read the report made by Richard Iannelli, who evaluated Mother and concluded, among other things, that Mother was able to be a fit parent. Dr. Young testified that, assuming that report was accurate, the contents of that report would not change his opinion that it was in the Child's best interest to remain with Petitioners.

Mother is 23 years old and currently lives in a duplex in Pleasant View, Tennessee. Mother has lived at her current residence for 15 months. She receives government assistance for day care and gas reimbursement, as well as food stamps and AFDC. Mother currently lives with her daughter, Kirsten. Mother attends school at the International Academy of Design and Technology and has been attending classes since January of 2006. Mother also works two part-time jobs as a server.

Mother acknowledged at trial that the Child was removed from her custody and care when he was only six weeks old. Mother testified that following the Child's removal, she participated in counseling for "domestic cases" and was taught how to look for signs of domestic abuse. Mother initially lived with her mother when Mother moved to Cheatham County. Mother would visit the Child either in Knoxville or in Cheatham County every other week. These visits were supervised.

With regard to the child abuse inflicted on Mother's oldest child, Kira, Mother admitted that she was at home when the abuse occurred, but she claimed she was asleep at that particular time. Kira was

three months old when the abuse occurred. Father is the biological father of both Kira and the Child. Mother stated that Father was very convincing when he claimed he had done nothing to harm Kira, and Mother believed him. Mother has since changed her mind about Father's guilt. Father currently is in prison for the severe abuse he inflicted on Kira. Mother has since divorced Father and has no contact with him. Mother was not charged criminally for abusing Kira, but she was found by the Juvenile Court to have failed to protect Kira. Mother admitted that Father was verbally and physically abusive to Mother.

Mother testified that she has full custody of Kirsten and she believes she is capable of taking care of both Kirsten and the Child. Mother acknowledged that Petitioners have taken care of the Child "very successfully." Mother also acknowledged that her bond with the Child was not as strong as the bond between the Child and Petitioners.

On cross-examination, Mother admitted that she has never had unsupervised visitation with the Child. Mother also admitted that Father returned to Mother's residence when he was released on bond after being charged with abusing Kira. On the very day that Mother and Father surrendered their parental rights to Kira, Mother and Father were married. At trial Mother claimed that she married Father at the suggestion of a DCS caseworker.

By agreement of the parties and the Trial Court, transcripts from the first trial were admitted as an exhibit during the second trial. Following the second trial,

the Trial Court issued a very thorough and detailed forty-eight page memorandum opinion. For the sake of brevity, we will not summarize all of the proof offered at the first trial which has relevance to the current appeal. Because the Trial Court's memorandum opinion discusses this pertinent additional proof, we will quote extensively from the Trial Court's opinion. The Trial Court initially noted that it was undisputed that grounds existed to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36–1–113(g)(4)[4]. The Trial Court then stated, in part, as follows:

[Because grounds exist to terminate Mother's parental rights], the sole issue is this case is whether it is in the child's best interest to do so. The legislature has provided the courts with a non-exclusive list of nine factors to consider when deciding that issue. Tenn.Code Ann. § 36–1–113(i). Counsel agree that in this consideration, *White v. Moody,* 171 S.W.3d 187 (Tenn.App.2004) is instructive.

In *White,* the Court of Appeals set forth a number of principles of law to bear in mind in conducting this analysis. The best interest of the child becomes paramount once the parent had been found to be unfit. The parent's interests do not evaporate upon the finding of unfitness. However, the focus shifts to the best interest of the child. *White,* at 192.

Further, a finding of unfitness does not necessarily require the parent's rights to be terminated. Not all parental misconduct is irredeemable and ter-

---

4. Tenn.Code Ann. § 36–1–113(g)(4) provides that one of the grounds for terminating parental rights is: "The parent or guardian has been found to have committed severe child abuse as defined in § 37–1–102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian."

mination of an unfit parent's rights may not always be in the best interest of the child. *Id.*

Ascertaining the child's best interest in a termination proceeding is a fact intensive inquiry requiring the Court to weigh statutory factors as well as any other relevant factors. The child's best interest must be viewed from the child's, rather than the parent's perspective. *White* at 193, 194 (citations omitted).

Ascertaining the child's best interest does not call for rote examination of each of the factors in Tenn.Code Ann. § 36–1–113(i) and then a determination of whether the sum of the factors tips in favor of or against the parent. Depending upon the circumstances of a particular child and a particular parent the consideration of one factor may dictate the outcome of the analysis. *Id.*

[The Child] was born on November 15, 2002. The Department of Children's Services removed him from his natural parents on December 30, 2002. Since June 20, 2003, he has lived with his current foster parents, the petitioners in this case. Since that time they have treated the child as their own.... They provided for all the child's physical, spiritual and educational needs....

[D]uring the pendency of these proceedings, [Mother] moved to Florida with Brian Yeck, the father of her third child. At the time the termination case was first set for trial in December 2004 she was living with Yeck and her infant daughter in a motel in Florida. [The Child], who had already exhibited symptoms of "splitting behavior", was at that time encouraged to call Mr. Yeck "Daddy Brian".

[Mother] argues that she has met all requirements imposed on her by DCS for reunification. The Court concedes that she has completed a number of classes and studies dealing with the care and nutrition of infants. She further was at least able to convince DCS that she had complied with all her requirements as this case proceeded.

However, the Court cannot ignore that individual counseling was recommended by Ms. Garland, Mr. Scott and others. [Mother] did go to Carolyn Moon "to comply with the placement plan". She was defensive and only saw Ms. Moon four times, or the equivalent of every other month, from September 2003 to June 2004. Nevertheless, [Mother] was able to convince DCS counselors that she had completed her individual counseling.

Mother did engage in so-called family therapeutic counseling that taught her to change diapers and prepare food. She resisted the recommendation for domestic violence classes and groups for non-offenders. She denied that her [ex-husband] had committed abuse. She has never acknowledged her role in failing to protect her child from abuse....

The Court will review each of the nine factors set forth in § 36–1–113(i). The first to be considered is whether the parent or guardian has made such an adjustment of circumstance, conduct or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian. From the record in this case it is impossible to determine whether such conditions currently exist in [Mother's] home. Ms. Kiser indicated [Mother] needed years of therapy. Ms. Moon would have continued therapy but [Mother] stopped attending. No treatment plan has ever been designed to deal with [Mother's] willing failure to protect her child from abuse.

Every course set upon by DCS has been geared toward teaching [Mother] how to discover child abuse and has

treated [Mother] as if she was unaware of any abuse. One cannot escape the fact that [Mother] has never acknowledged any role in the abuse and in fact persistently denied for years that the abuse ever occurred.

The second factor to be considered is whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not reasonably appear possible. Again, the answer to this inquiry is unknown. At the original trial, [Mother] was dependent upon her mother for housing. As far as this Court knows, no one has observed [Mother] in her current household. If DCS counselors have done so, they were not called to testify....

The third criteria is whether the parent or guardian has maintained a regular visitation or other contact with the child. As previously stated, [Mother] made two moves during the pendency of this litigation that made regular visitation more difficult, if not improbable. Further, from November 2005 until June 2006 she did not visit the child at all. There were few visitations between June 2006 and October 2006. She maintains that she has kept regular visits with the child since October 2006.

The fourth consideration is whether a meaningful relationship has otherwise been established between the parent or guardian and the child. Cheryl Kiser, the only expert to testify who evaluated both the petitioners and [Mother], was of the opinion that this child's primary attachment was with the petitioners. There was a secondary attachment with [Mother] similar to the relationship that a child might have with a teacher or daycare worker.

There was substantial un-refuted testimony regarding physical effects this child displayed after visits with [Mother]. These include rather severe stuttering and behavioral problems....

The fifth consideration is the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and mental condition. Counsel for [Mother] conceded that this might not weigh in her favor. Indeed, Dr. Young testified that at best this child will have psychological scars and wounds as a result of this transition to [Mother]. Ms. Kiser testified [Mother] was not capable of assisting the child with the adjustment necessitated by returning him to [Mother]. Indeed, she said that [Mother] would not recognize the stress the child was under and that [Mother] was not emotionally available to him and would not be so until she underwent years of therapy. The problem is vividly demonstrated from [Mother] herself when she testified that she thinks that the petitioners and the experts are making more of the transition than it would be.

Considerations number six and seven deal with whether the parent or guardian or other person residing with the parent or guardian has shown brutality, physical, sexual, emotional or psychological abuse or neglect toward the child or another child or adult in the family or household and whether the physical environment of the parent's home is healthy and safe, whether there is criminal activity in the home, use of alcohol, controlled substances and so forth as may render the parent or guardian consistently unable to care for the child in a safe and stable manner. Again, the Court, based on this record, has little or no information concerning [Mother's] current residence or persons living in her home.

Consideration number eight deals with whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child. It seems that all of the experts that have testified in this case have expressed concerns about [Mother's] mental and/or emotional status. She has refused to engage in therapeutic activities such as a group for non-offenders and intensive psychotherapy. Ms. Kiser and Dr. Young have recommended against reunification.

The ninth consideration is whether the parent or guardian has paid child support consistent with the child support guidelines.... [Mother] had paid approximately $2700.00 in child support during this child's entire life. $804.00 of this came from an IRS intercept on March 16, 2007 ....

The Court finds by clear and convincing evidence that the parental rights of [Mother] should be terminated on the grounds that she was found by the Juvenile Court of Knox County to have been guilty of severe child abuse as to another child in the household from her gross knowing failure to protect that child. Tenn.Code Ann. § 36–1–113(g)(4). Further she has willfully failed to pay support for a period of four consecutive months immediately preceding the filing of this petition and/or has only provided token support pursuant to Tenn.Code Ann. § 36–1–102(1)(A)(i)(B).

Additionally, based on the foregoing analysis the Court finds by clear and convincing evidence that termination of the parental rights of [Mother] ... is in the best interest of [the Child].

As mentioned previously, Mother raises only one issue on appeal. Specifically, Mother claims that clear and convincing evidence that termination of her parental rights was in the Child's best interest was not presented to the Trial Court.[5]

### Discussion

Our Supreme Court recently reiterated the standard of review for cases involving termination of parental rights. According to the Supreme Court:

This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R.App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002) (citing Tenn.Code Ann. § 36–1–113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn.2006).

As correctly noted by the Trial Court, in Tenn.Code Ann. § 36–1–113(i) (Supp.2007), the General Assembly set forth a list of

---

**5.** The Department of Children's Services chose not to file a brief in this appeal and, therefore, has taken no position as to the propriety of the Trial Court's termination of Mother's parental rights. The Child's Guardian ad Litem, as did Petitioners, filed a brief and argues that the Trial Court correctly found clear and convincing evidence had been presented such that it was in the Child's best interest to terminate Mother's parental rights.

non-exclusive factors to be considered when ascertaining what is in a child's best interest. This statute provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36–5–101.

The Child was removed from Mother's care and custody following severe child abuse committed by Father against the Child's older sibling, Kira, who was only three months old when the abuse occurred. Although Mother did not physically abuse Kira herself, she was, nevertheless, found to have committed severe child abuse by her knowing failure to protect her infant child. On the very day Mother and Father voluntarily surrendered their parental rights to Kira, Mother married Father. For a long time after the abuse occurred, Mother failed to acknowledge that Father had committed the abuse and stood by Father who denied doing anything to harm Kira. It was this abuse and Mother's continued relationship with Father which ultimately led to the Child's removal from Mother's custody.

Following the Child's removal, Mother did complete some of the requirements necessary for reunification. However, the Trial Court specifically found that she had failed to receive all of the individual counseling that was recommended to her or made only a cursory attempt to comply. The facts do not preponderate against this finding. While the Child was in foster care in Knoxville, Mother moved to Florida and then to Cheatham County, Tennessee, making visitation with the Child that much more difficult. The evidence is undisputed that when visitation did occur, it had profound negative effects on the Child,

resulting in severe stuttering and other problems.

Over the years, the Child has developed a significant bond with his foster parents, S.S. and R.S. On the other hand, the bond between Mother and the Child was analogized to a bond between a child and a teacher or daycare worker. The proof does not preponderate against the Trial Court's finding that severing the bond between the Child and his foster parents would be traumatic to the Child.

After carefully reviewing all of the evidence in this case, we conclude that the evidence does not preponderate against the factual findings made by the Trial Court. We further conclude that the facts, as found by the Trial Court, establish clearly and convincingly that it is in the Child's best interest for Mother's parental rights to be terminated.

### *Conclusion*

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. Costs on appeal are taxed to the Appellant, M.L.P.E. and her surety, if any.