IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned On Briefs April 26, 2012

## IN THE MATTER OF: JOSHUA E.R., JR.

**Direct Appeal from the Juvenile Court for Benton County**
**No. 6095      Larry Logan, Judge**

---

**No. W2011-02127-COA-R3-PT - Filed May 15, 2012**

---

The trial court terminated parents' parental rights on the grounds of severe child abuse. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

J. Neil Thompson, Huntingdon, Tennessee, for the appellant, Mother.

Daniel E. King, Camden, Tennessee, for the appellant, Father.

Robert E. Cooper, Jr., Attorney General and Reporter and Shanta J. Murray, Assistant Attorney General, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

On October 14, 2010, the Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Benton County to terminate the parental rights of Mother and Father to their child Joshua E. R., Jr., born September 1, 2010. In its petition, DCS alleged that Joshua was brought into protective custody upon being discharged from the hospital on September 3, 2010, and that Joshua had tested positive at birth for amphetamines, benzodiazepines, hydrocodone, methamphetamines, and opiates. DCS further alleged that Joshua suffered from withdrawal from the illicit drugs at birth. DCS alleged that Mother had committed severe child abuse by abusing drugs during her pregnancy, that Father had committed severe child abuse by providing Mother illegal drugs during the course of the pregnancy, and that termination of parental rights was in Joshua's best interest. Mother and

Father were appointed separate counsel, and the trial court heard the matter on May 27, 2011. The trial court found that clear and convincing evidence supported a finding that Mother and Father had committed severe child abuse and that termination of their parental rights was in Joshua's best interest. The trial court entered final judgment in the matter on August 25, 2011, and Mother and Father filed timely notices of appeal to this Court.

### *Issues Presented*

Mother and Father submit that the trial court erred in finding that they committed severe child abuse by clear and convincing evidence. Mother additionally contends that the trial court erred by finding that prenatal drug exposure constitutes severe child abuse.

### *Standard of Review*

We review the decisions of a trial court sitting without a jury *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates otherwise. *In Re: Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. R. App. P. 13(d). No presumption of correctness attaches, however, to a trial court's conclusions on issues of law. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000); Tenn. R. App. P. 13(d). Tennessee Code Annotated § 36–1–113 governs the termination of parental rights. The Code provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
> 
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> 
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36–1–113(c)(2010). Thus, every termination case requires the court to determine whether the parent whose rights are at issue has chosen a course of action, or inaction, as the case may be, that constitutes one of the statutory grounds for termination. A parent may not be deprived of their fundamental right to the custody and control of their child unless clear and convincing evidence supports a finding that a statutory ground for termination exists and that termination is in the best interests of the child. Tenn. Code Ann. § 36–1–113(c)(2010). Although the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard, it does not require the certainty demanded by the "beyond a reasonable doubt" standard. *In Re: M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005). Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth.

*Id.* Insofar as the trial court's determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent evidence of clear and convincing evidence to the contrary. *Id.*

The heightened burden of proof in parental termination cases requires us to distinguish between the trial court's findings with respect to specific facts and the "combined weight of these facts." *In Re: Michael C. M.*, No. W2010–01511–COA–R3–PT, 2010 WL 4366070, at *2 (Tenn. Ct. App. Nov. 5, 2010)(quoting *In Re: M.J .B.*, 140 S.W.3d 643, 654 n. 35 (Tenn. Ct. App. 2004)). Although we presume the trial court's specific findings of fact to be correct if they are supported by a preponderance of the evidence, we "must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion." *Id*.

### *Discussion*

We turn first to Mother's assertion that the trial court erred by determining that prenatal drug exposure constitutes severe child abuse. Severe child abuse constitutes a ground for the termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(4)(2010). The Code defines severe child abuse to mean:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
> (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;
> (C) The commission of any act towards the child prohibited by §§ 39-13-502--39-13-504, 39-13-522, 39-15-302, 39-15-402, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child; or
> (D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring[.]

Tenn. Code Ann. § 37-1-102(23)(Supp. 2011). Mother asserts that this Court and the Court of Criminal Appeals differ with respect to whether prenatal drug abuse constitutes severe child abuse. She submits that our holding that prenatal drug abuse constitutes severe child abuse for the purposes of terminating parental rights is "flawed" because it has the effect of encouraging a woman who has abused drugs to abort the fetus rather than risking having her parental rights to a child terminated. She further asserts that, under our holdings, a woman who smokes cigarettes or consumes alcohol during pregnancy has committed severe child abuse in light of the numerous studies on the effects of alcohol and nicotine on a fetus. Mother asserts, "[t[his can be taken to the farthest extreme of mothers who do not seek prenatal care or properly diet during their pregnancy."

This Court has held that prenatal drug abuse may constitute severe child abuse as defined by section 37-1-102(23) for the purposes of terminating parental rights. *In re B.A.C.*, 317 S.W.3d 718, 725 (Tenn. Ct. App. 2009), *perm. app. denied* (Tenn. Feb. 22, 2010); *Cornelius v. State, Dept. of Children's Servs.*, 314 S.W.3d 902, 910-911 (Tenn. Ct. App. 2009), *perm. app. denied* (Tenn. Feb. 22, 2010). A finding of grounds, moreover, is not sufficient to terminate a parent's rights to the custody of their child. As noted above, the Tennessee Code establishes a two-part inquiry in which the courts must engage before terminating a parent's rights. After the court has determined, by clear and convincing evidence, that a statutory ground exists for the termination of parental rights, the court must then determine whether convincing evidence supports a finding that termination is in the child's best interest. Tenn. Code Ann. § 36–1–113(c)(2010). As we previously have observed, "[n]ot all parental misconduct is irredeemable and termination of an unfit parent's rights may not always be in the best interest of the child." *In re Adoption of D.P.E.*, 271 S.W.3d 670, 675-76 (Tenn. Ct. App. 2008)(citation omitted).

We consistently have emphasized that parents' rights to the care and custody of their children is a fundamental constitutional right. *E.g., Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002)(citation omitted). A parent's rights continues and is superior to the rights of all others unless the "parent consents to relinquish them, abandons his or her child, or forfeits his or her parental rights by some conduct that substantially harms the child." *Id*. (citation omitted). We are ever mindful, moreover, that "'[f]ew consequences of judicial action are so grave as the severance of natural family ties.'" *In re Adoption of Destiny R.D.*, No. M2011–01153–COA–R3–PT, 2012 WL 1066496, at *5 (Tenn. Ct. App. Mar. 27, 2012)(quoting *M.L.B. v. S.L. J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982))). Only where there is clear and convincing evidence of a statutory ground for the termination of rights, coupled with clear and convincing evidence that termination of parental rights is in the best interest of the child, will the courts grant a petition to terminate a parent's rights to his or her child. *E.g., In re Valentine*, 79 S.W.3d 539 (Tenn. 2002). In light of our prior holdings, and the supreme court and General Assembly's

disinclination to overrule them, we continue to hold that prenatal drug abuse may constitute severe child abuse for the purpose of terminating parental rights.

We next turn to whether clear and convincing evidence supports the trial court's determination that Mother committed severe child abuse by exposing Joshua to prenatal drug abuse. Mother contends that the trial curt failed to address the issue of whether she knowingly committed severe child abuse. She asserts that she is a long-time drug abuser who began to use methamphetamines at age 16. She further asserts that she is "not well-educated" and that, although she used drugs during a previous pregnancy, her older child suffered no ill effects as a result of her drug use. Mother asserts that she had no reason to believe that her prenatal drug abuse would harm Joshua. Mother also asserts that the trial court erred in finding that she had pled guilty to a criminal charge of attempted aggravated child abuse and neglect where there is nothing in the record to indicate the charge to which she pled guilty. She asserts that the criminal court judgment relied on by the trial court does not contain the victim's name and does not recite any factual basis for the guilty plea. She asserts that there is no evidence in the record to support the trial court's finding that she had pled guilty to severe child abuse. Mother asserts that the record does not support a determination that she "knowingly" exposed Joshua to harm. Mother further contends that there is nothing in the record to demonstrate that Joshua suffered any ill effects due to her prenatal drug abuse.

We begin our discussion by noting that it is not disputed that Mother used illegal drugs during her pregnancy. Mother also does not assert that Joshua was not born with illegal drugs in his system. It is clear from the medical evidence contained in the record, moreover, that Joshua suffered withdrawal symptoms after birth. It is also clear from the record that he is at increased risk to suffer long-term effects from Mother's prenatal drug abuse, including learning disabilities, developmental delays, and behavioral difficulties. Mother does not challenge the trial court's factual findings, except to state that the evidence does not demonstrate that she pled guilty to attempted aggravated child abuse. Rather, the issue presented by Mother, as we perceive it, is whether her prenatal drug abuse constitutes "knowing" child abuse. Mother contends that she simply did not know that her prenatal drug abuse was harmful to her child.

Mother was 28 years of age when this matter was heard. She has five children. Four of Mother's children are also Father's; none of the children are in the custody of Mother or Father. Mother was incarcerated at the time this matter was heard, and, contrary to Mother's assertion in her brief, the record contains a copy of a January 2011 Benton County Criminal/Circuit Court judgment demonstrating that Mother pled guilty to attempted aggravated child abuse.

Mother testified that her older children had been removed from her care as a result of her drug abuse. Mother further testified that her two-year old daughter had been removed from her custody at birth after testing positive for opiates. Mother testified that she used illegal drugs when she was six to seven months pregnant with Joshua, and that she and Father "stayed here and there" during the pregnancy.

Mother testified that, notwithstanding the removal of her daughter at birth as a result of Mother's prenatal drug abuse, it did not "go through [her] mind that [she] was hurting [her] baby." She testified that she went to rehabilitation in order to attempt to regain custody of her two-year old child, but that she "relapsed" and began to use drugs again. Mother denied that Father knew of her drug use during her pregnancy, but also testified that she and Father used drugs together within the prior two years, and that she was aware that Father had failed a drug screen in the previous two months. Mother testified that she had been charged with aggravated child abuse; that she had not been able to provide a home for her children in the previous four years; and she intended to seek rehabilitation again.

Although "knowing" is not defined by the statute, we have opined that a parent acts "knowingly" when acting with actual knowledge of the relevant facts and circumstances or when a parent acts with deliberate ignorance of or with reckless disregard of information that has been presented to him or her. *Dep't of Children's Servs. v. Byrd*, No. W2011–01249–COA–R3–JV, 2012 WL 525518, at *9 (Tenn. Ct. App. Feb. 17, 2012), *perm. app. denied* (Tenn. April 12, 2012)(citation omitted). In this case, Mother testified that she knew it was wrong to use drugs while she was pregnant, but that she did not think it would be harmful to her baby. Mother also testified that she hid her drug use from her doctors because she knew it was wrong, although she did not realize it would be harmful to her baby. It is undisputed, however, that DCS removed Mother's older child from Mother's custody at birth because she tested positive for drugs. We affirm termination of Mother's parental rights based on severe child abuse.

We next turn to whether clear and convincing evidence supports the termination of Father's parental rights on the grounds of severe child abuse. The definition of "severe child abuse" under Tennessee Code Annotated § 37-1-102 includes not only affirmative acts of abuse, but also the knowing failure to protect a child from abuse. The trial court found that Father had failed to protect Joshua from abuse by providing Mother with illegal drugs while she was pregnant.

It is undisputed in this case that Father has a history of drug abuse. At the hearing of this matter, Father testified that he used methamphetamines a few weeks before Joshua was born; that he has used cocaine and abused Lortab; and that in March 2011 he tested positive for cocaine, "benzos," opiates, and marijuana. Father asserts, however, that he did not supply

Mother with drugs while she was pregnant with Joshua, and that he did not know of her drug use. Although Mother also testified that Father did not know that she was using drugs while pregnant, it is not disputed that Mother and Father had a history of using drugs together. Father testified that he had been criminally charged for providing drugs to Mother, and that he entered a plea to the lesser charge of child abuse and neglect. Father also testified that he and Mother lived at Mother's grandmother's home while Mother was pregnant, and that Mother's brother brought drugs into the home. Father acknowledged, however, that he had stated that Mother had been using "codeine products" on the hospital intake form when Mother was admitted to the hospital for Joshua's birth, and that he assumed that Lortab was a codeine product.

Mother's brother ("Brother") testified that Mother had told him that Father had given her Hydrocodone while she was pregnant. Brother also acknowledged making a written statement to the police stating that Mother had told him that Father had provided Mother with Methamphetamine and Hydrocodone. He asserted that he gave a statement to the police to "clear [his] name." Brother testified that Mother told him that Father gave her Methamphetamine and Hydrocodone while she was pregnant. Brother testified that Mother and Father lived with family friends for a while during the course of the pregnancy, and that those friends had been arrested for manufacturing Methamphetamines. Brother testified that he was incarcerated during most of the time Mother was pregnant, but that he was aware that Mother was using Methamphetamine while pregnant.

Amber Hugley (Ms. Hugley), a former neighbor of Mother and Father, testified that she had observed Father questioning Mother about whether she was "doing anything," and that Mother would assure Father she was "not doing nothing." Ms. Hugley testified that she had never seen Father and Mother taking drugs together. She also testified that she did not know whether Mother had used drugs while she was pregnant, and that she had never seen her using drugs. Ms. Hugley testified that she had seen mother approximately 30 times during the pregnancy.

In its August order terminating Mother and Father's parental rights, the trial court stated:

> Both [Mother] and [Father], despite both pleading guilty to the use and furnishing of methamphetamines during her pregnancy, have tried to hide his knowledge of her drug use. The Court simply does not believe him.

The trial court further found that Brother had testified that he knew that Father had given Mother drugs while she was pregnant, and that he had confirmed this in a written statement to the police. The trial court stated:

Based on the prior findings of the General Sessions and Circuit Courts and the factual findings of this Court, it is abundantly clear that the child was exposed to severe abuse and both biological parents were involved.

The trial court further found, by clear and convincing evidence, that termination of parental rights was in Joshua's best interest.  We agree.

### *Holding*

Upon review of the entire record in this cause, we affirm the judgment of the trial court.  This matter is remanded to the trial court for enforcement of the judgment and the collection of costs.  Costs of this appeal are taxed to the Appellants.

_____
DAVID R. FARMER, JUDGE