IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 14, 2005

## IN THE MATTER OF:  A.S., Q.S., AND J.S.

**Appeal from the Juvenile Court for Davidson County**
**No. 2119-61600; 2119-61601; 2119-61602      Betty Adams Green, Judge**

---

**No. M2005-00748-COA-R3-PT - Filed November 10, 2005**

---

This is a mother's appeal of the termination of her parental rights to her three children.  Mother suffers from a cocaine addiction.  She has had numerous opportunities for rehabilitation but failed to stay drug-free.  At the time of trial, the children had been in foster care for two years during which time Mother only exercised token visitation.  The juvenile court terminated Mother's parental rights on grounds of abandonment, persistence of conditions, and substantial non-compliance with the permanency plan.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN, and PATRICIA J. COTTRELL, JJ., joined.

John C. Ford, Nashville, Tennessee, for the appellant, the mother.

Paul G. Summers, Attorney General and Reporter; and Amy T. Master, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

Jeanah P. McClure, Guardian ad litem.

### MEMORANDUM OPINION[1]

The difficulties faced by Mother's three children A.S., Q.S., and J.S began prior to their birth because their mother tested positive for cocaine at the birth of all three children.  The youngest child, J.S., was born substance affected.

---

[1]Tenn. Ct. App. R. 10 states:

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value.  When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

All three children came into the custody of the Department of Children's Services in May of 2001. Prior to DCS obtaining custody, DCS had instituted an arrangement with Mother whereby she would retain custody of the children on the condition that she complete a drug and alcohol assessment and follow all subsequent recommendations. Although Mother completed the assessment program and entered a rehabilitation program, she failed to complete the rehabilitation program. Moreover, on May 2, 2001, she tested positive for cocaine, and DCS subsequently took custody of the children. DCS first placed the children with their grandmother, but when their grandmother tested positive for marijuana, the children were placed in foster care.

Mother subsequently attended a permanency plan staffing with her attorney. The goal was to return the children to Mother. She entered into a permanency plan on May 17, 2001. The plan required that she maintain regular contact with the children, pay child support, attend drug treatment, have no positive drug screens, maintain a stable living environment for at least six months, and obtain and maintain employment for at least six months. Mother completed the drug treatment program, and the children were returned to their mother in June of 2001 on a trial basis.

Mother's success was short lived. While the children were with Mother in June 2001, she failed to report for a court appearance and it was soon discovered that she had relapsed into drug use. As a consequence, the children were again placed in foster care in September of 2001. Two months later, Mother was arrested on drug charges.

Thereafter, Mother entered into a second permanency plan, which had similar requirements to the first plan. On May 10, 2002, less than two weeks after entering into the new permanency plan, Mother attended a permanency hearing during which she was requested to take a drug test. She declined explaining she would test positive for cocaine. In June of 2002, Mother entered a drug treatment program, which she completed, and then began a four week out-patient follow-up program. She had a negative drug screen in August of 2002, but tested positive for cocaine on September 26, 2002. DCS continued to perform or attempt to perform drug tests over several months; however, Mother refused a drug screen requested October 21, 2002, failed to appear for an April 24, 2003, drug screen, and on April 29, 2003, Mother again refused to be tested, admitting at the time of the test that she had been drinking alcohol. Thereafter, in May of 2003, she invalidated a test by dropping it in the toilet.

From June 6, 2002, through September 18, 2002, Mother visited her children on only five or six occasions. Most of these visits lasted only an hour, and on one occasion, Mother was forty minutes late.[2] Mother was offered the opportunity to attend A.S.'s birthday party and to see her children for the Christmas holidays, but she failed to appear at either occasion. On one occasion, Mother arrived at the children's foster home at 9:30 p.m. intoxicated. Mother failed to visit the

---

[2]The juvenile court found five different visits. Mother contends there was a sixth visit, but even if that is the case, six visits as opposed to five is not enough to preponderate against the judge's finding that these were merely token visits, especially in light of the fact that from October 23, 2002, through May 2, 2003, Mother had no visits with the children.

children thereafter until May 2, 2003. A third permanency plan staffing took place on May 12, 2003, the goal of which was changed to adoption.

By September of 2003, Mother had violated the terms of her probation from the November 2001 drug arrest. She turned herself in to the police, and at the time this trial took place regarding the termination of her parental rights, Mother was incarcerated. The children had lived in a foster care home since September 2001. The foster mother testified at trial that if given the opportunity, she would adopt the children.

On February 16, 2005, the juvenile court entered a Final Decree terminating Mother's parental rights[3] on "grounds of abandonment, persistence of conditions, and substantial non-compliance with the permanency plan." The court also found by clear and convincing evidence that termination of Mother's parental rights was in the children's best interest.

## GROUNDS FOR TERMINATION

The Department of Children's Services filed the Petition to terminate parental rights on September 25, 2002. For much of the year prior to that, Mother had only exercised token visitation with the children. The record reveals that Mother was occasionally employed, though her employment was not stable, and she failed to pay child support. It also reveals her lifestyle was anything but drug-free. She failed numerous drug tests, failed to complete the aftercare programs, lapsed back into drug use, and at the time of trial, was incarcerated for violation of her parole.

She contends her lack of visitation was due to scheduling restrictions placed on her by DCS as a result of her arrest in November of 2001. Mother's argument, however, does not explain why she failed to even attempt to schedule visits through DCS for a significant period and why her only visits were abbreviated and infrequent.

The juvenile court found Mother failed to comply with the permanency plans by not paying child support, not maintaining a stable living environment, not completing the alcohol and drug program and aftercare, and not remaining drug free. The evidence in the record clearly and convincingly supports these findings. Moreover, they clearly establish that Mother failed to remedy the conditions that led to the removal of her three children.

## BEST INTERESTS OF THE CHILDREN

The juvenile court found that termination of Mother's parental rights was in the best interest of the children, primarily because she had not adjusted her conduct or conditions to make it in the children's best interest to return home. The court also found that she failed to establish a meaningful

---

[3]The juvenile court also terminated the parental rights of each child's father. None of the fathers appealed this decision.

-3-

relationship with her children, and taking the children away from their foster home would have a negative emotional and psychological impact on them.

The children's best interests must be viewed from the children's perspective, rather than the parent's perspective. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (citations omitted). The record clearly establishes that returning the children to their mother is not an option because doing so would pose a significant threat of harm to the children. It also establishes that the children are in a safe and loving environment with the foster family they have resided with since 2001, and taking them away from that environment would negatively impact the children. Further, as returning the children to Mother is not an option, not terminating Mother's rights would result in the children remaining in limbo, in temporary foster care instead of attaining a stable future through adoption. Accordingly, the record clearly and convincingly establishes that termination of Mother's parental rights is in the children's best interests.

### IN CONCLUSION

The judgment of the juvenile court is affirmed, and this matter is remanded with costs of appeal assessed against Appellee, State of Tennessee, Department of Children's Services.

_____
FRANK G. CLEMENT, JR., JUDGE