# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 8, 2012

## IN RE EILA L.G. ET AL.

**Appeal from the Juvenile Court for Hawkins County**
**No. HJ-11-0703     Thomas J. Wright, Judge**

---

**No. E2012-00922-COA-R3-PT - Filed January 2, 2013**

---

This is a termination of parental rights case focusing on four minor children ("the Children") of the defendant, Tabitha W. ("Mother"). The Department of Children's Services ("DCS") took the Children into custody in July 2010 because of Mother's continuing drug use and the Children's truancy problems. DCS filed a petition to terminate the parental rights of Mother in July 2011, alleging that numerous grounds for termination exist. Following a bench trial, the court granted the petition after finding, by clear and convincing evidence, that Mother was in substantial noncompliance with her permanency plan, and that the conditions originally leading to removal still persisted. The court also found, by clear and convincing evidence, that termination was in the Children's best interest. Mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, Tabitha W.

Robert E. Cooper, Jr., Attorney General and Reporter, and John H. Bledsoe, Senior Counsel, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.

The Children involved in this case are Eila L.G. (DOB: Nov. 12, 1996), Jasmine R.G. (DOB: Nov. 15, 1999), Eric M.D. (DOB: Aug. 1, 2003), and Derek W.W. (DOB: Mar. 21,

2006). DCS first became involved with the Children in December 2009 when a Family Support Service case was opened because of truancy issues. DCS did not take custody at that time; rather it placed the Children in the home of the maternal grandmother. DCS put services into her home in an effort to prevent removal. The Children's situation did not improve, however, and they continued to miss school and mental health appointments. Mother admitted to using drugs, including methamphetamines and marijuana. Mother's continued drug use resulted in the Children coming into DCS custody in June 2010 because the maternal grandmother was unable to care for the Children by herself.

The Children were placed in foster care, and a permanency plan was developed. The permanency plan required Mother to have (1) a parenting assessment, (2) an alcohol and drug assessment, and (3) a mental health intake. She was directed to follow all recommendations. The permanency plan also required her to remain drug free and submit to random drug screens. The permanency plan further required her to cease incurring criminal charges. Under the plan, she was not to expose the Children to others with criminal charges/drug issues, and she was to obtain proper housing for the Children.

On July 1, 2011, DCS filed a petition to terminate the parental rights of Mother. DCS asserts that Mother was in substantial noncompliance with her permanency plan, that she had failed to provide a suitable home for the Children despite reasonable efforts by DCS to help her, and that the conditions leading to removal still persisted. DCS also alleged that termination was in the Children's best interest. A trial on the petition was held over multiple days. Following the trial, the court ruled that DCS had proven, by clear and convincing evidence, that Mother was in substantial noncompliance with her permanency plan, and that the conditions leading to removal still persisted. The court also found, by clear and convincing evidence, that termination was in the Children's best interest. Mother filed a timely appeal.

II.

Mother presents the following single issue for our review:

> Whether the trial court erred in finding that it was in the Children's best interest to terminate Mother's parental rights.

III.

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The

trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness, a presumption we must honor unless the preponderance of the evidence is against those findings. *Id.*; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's determinations of witness credibility, which will not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

As this Court has often stated:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S.*, No. E2011-00517-COA-R3-PT, 2011 WL 4553233 (Tenn. Ct. App. E.S., filed Oct. 4, 2011)(citations omitted).

IV.

A.

Mother does not contest the trial court's finding that there are sufficient grounds for termination. Rather, Mother argues that the trial court erred in concluding that clear and convincing evidence supported a finding that termination is in the Children's best interest. Since the grounds for termination in this case are relevant to the trial court's analysis of "best interest," we will briefly consider the grounds for termination.

As discussed above, DCS alleged several grounds to justify termination of Mother's parental rights. Only one ground must be proven by clear and convincing evidence to justify termination. *In re Audrey S.*, 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005). The trial court found that at least two grounds were proven by clear and convincing evidence.

We will first consider DCS's position that Mother is in substantial noncompliance with the permanency plan. The evidence was undisputed that Mother had not complied with a major requirement of her plan, *i.e.* becoming and remaining drug free. As the trial court found, Mother had not shown improvement in this area. While she was no longer using illegal drugs, she was still abusing her prescription medication by taking more than was prescribed. Mother had prescriptions for pain pills and Xanax, but when DCS conducted random pill counts, Mother was consistently found to have taken more than the prescribed amount. In fact, Mother admitted at trial that she often took more than what was prescribed. As the trial court found, Mother had not dealt with her substance abuse problem in a meaningful way. Rather, she had merely substituted prescription drugs for illegal drugs.

Mother had also failed to remain free of criminal charges. She pleaded guilty to a charge of accessory after the fact (for harboring a fugitive) in October 2010, and again in February 2011. As a result, Mother spent several months in jail while the Children were in DCS custody. Further, while Mother had completed her initial assessments for parenting, alcohol/drugs, and mental health, she did not show that she had followed through with the recommendations associated with those assessments. For example, Mother's parenting assessment recommended that she enter an intensive inpatient therapy program, followed by time in a halfway house, but Mother did not follow either recommendation. Also, Mother had been given substantial instruction/correction regarding her parenting skills over almost a two-year period, but she had failed or refused to improve her parenting of the Children during her visits with them, such that she could be safely trusted to visit unsupervised.

Given these facts, we conclude that the evidence does not preponderate against the court's finding, made by clear and convincing evidence, that Mother was in substantial noncompliance with the permanency plan. As previously noted, Mother does not take issue with this ruling.

B.

Mother's argument is that DCS failed to show, by clear and convincing evidence, that termination is in the Children's best interest. When at least one ground for termination of parental rights has been established, as here, DCS must then prove, by clear and convincing evidence, that termination of the parent's rights is in a child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit by

establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. 182 S.W.3d at 877.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2012) provides a list of factors the trial court is to consider when determining if termination is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878. Further, the best interest of a child must be determined from the child's perspective and not that of the parent. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tenn. Code Ann. § 36-1-113(i) lists the following factors for consideration:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or

controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

C.

In this case, the trial court considered the above factors and made the following findings:

Leaving the Children in limbo would be harmful to them.

Mother's empty promises to the Children that they would be reunited soon rendered the Children unable to make progress toward resolving their own mental health issues.

The Children needed to maintain safe, secure, therapeutic and permanent homes.

Mother's actions of harboring fugitives in her home and continuing to abuse drugs indicated her wanton disregard for the Children.

Mother's substance abuse issues made it unsafe for the Children to be with her.

Mother had failed to effect a lasting adjustment after reasonable efforts by social service agencies for such a duration of time that lasting adjustment did not appear reasonably possible.

The Children's emotional, psychological, and behavioral conditions would "debilitate and disintegrate" if there was a change in caretakers to Mother.

The Children were somewhat stable in their current placements.

Mother had shown neglect toward the Children in the past by exposing the Children to her drug abuse, and also exposing them to others who had criminal problems (especially a man who had "engaged in physical, as well as sexual abuse of her or other persons"), which resulted in a prior custody episode in Ohio.

The criminal and drug activity in Mother's home rendered it unsafe.

Mother testified that she was overwhelmed with anxiety, necessitating the abuse of her anxiety medication, when she has no job, is not taking care of her Children, and receives a monthly check from social security.

Mother testified that she was bipolar, but only recently began being treated for this condition.

Mother's mental/emotional state was worsening without having custody of the Children, which gave the court concern that Mother would not be able to effectively or safely parent if the Children were returned to her.

(Paragraph numbering in original omitted.)

These findings were amply supported by the evidence presented at trial. Despite receiving help from DCS for nearly two years, Mother had not made such an adjustment of her circumstances to make it safe for the Children to be returned to her. She continued to abuse drugs, and had not received any real treatment for this problem. She had incurred two separate criminal charges for harboring a fugitive, *i.e.*, the cousin of the man she lived with in Ohio who committed domestic violence against her and who was a registered sex offender. Mother spent several months in jail as a result, when she should have been working on her permanency plan. Since her release, Mother asserts that she had "turned her life around," yet she still abused her prescription medication and failed to follow through on her permanency plan requirements.

-7-

Mother admitted that the Children were in protective custody for approximately three years in Ohio, before she moved to Tennessee, because she was living with a registered sex offender who abused her. Thus, the older children had spent a total of five years in foster care up to the time of trial. Mother admitted to having mental health and drug issues with which she had not dealt. The record does not preponderate against a finding, by clear and convincing evidence, that Mother has failed to make the lasting adjustment contemplated by Tenn. Code Ann. § 36-1-113(i)(1).

Mother had maintained regular visits with the Children when she was not incarcerated, and did appear to have a meaningful relationship with them. Those visits were always supervised. Mother failed to develop effective parenting skills such as would keep the Children safe. There was testimony that Mother refused to discipline the Children, even when they were aggressive/violent toward each other, and often let them wander out of her sight when the visits were held in a park. Despite receiving in-depth parenting instruction after every visit, Mother's parenting skills failed to improve, and the providers testified that she was either unwilling or unable to put the information into practice.

The Children's therapist testified that if the Children were moved from their current placements and returned to Mother, they would all regress emotionally and behaviorally. The therapist and the "parenting specialists" who oversaw visitation all testified that the Children desperately needed structure and consistency, and that Mother could not or would not provide it. None of these witnesses would even recommend that Mother be allowed unsupervised visits with the Children because she seemed unable to control the Children without significant help. One "specialist" testified that with the help Mother was receiving, visitation should have improved to the point that he and his co-worker could "sit back" and simply supervise the visit without intervening. He testified that this never happened, however, because Mother would not discipline the Children on her own, would not set boundaries for them, and would not be consistent. All of the witnesses testified that Mother's lack of proper boundaries created physical danger for the Children.

Likewise, Mother created emotional issues for the Children by continually making them promises that they would "be together soon" or that she was "getting them back." Mother was repeatedly counseled about making false promises, yet this behavior persisted. Mother was often found whispering to the older children during visits about such matters. Mother wrote letters to the Children when she was incarcerated, stating that if she lost them she would "lay down and die" and other such inappropriate remarks. Mother did not seem to understand that this was harmful to the Children, testifying at trial that she simply wanted them to know she was trying.

The proof showed that each child had significant mental/behavioral issues requiring treatment consisting of intensive therapy plus medication. DCS had been challenged to find placements that would work. Eila, the oldest, was very withdrawn when she came into custody, and the therapist testified that it had taken months to gain her trust and get her to "open up". The therapist also testified that Eila had "brightened" and was now doing better, although she still had impulse control and ADHD issues. Jasmine had the most significant problems, having twice attempted suicide before coming into custody. Jasmine had also tried to stab her first foster father and another caretaker. Jasmine was diagnosed with mood disorder with psychosis, and was receiving intensive therapy. She had been moved to a foster home where she could be the only child and receive more individualized attention (plus not create a safety issue for the others).

Eric was diagnosed with Asperger's and ADHD, and had likewise been moved to a different foster home to have more individual attention and structure. The therapist testified that Eric was beginning to do better, and had started showing empathy and remorse, which he had not done before. Derek had also been diagnosed with ADHD, and the therapist stated that he was also doing well in therapy, but still had problems sitting still at school. Derek and Eila remained in the original foster placement. Derek and Eila were described as having a very strong bond, and the caseworker testified that the foster parents wanted to adopt them. The therapist testified that Eila, who was fifteen years old at the time of trial, had expressed to her that she loved Mother, but did not think that being with Mother was in her best interest. The witnesses testified that the Children were stable in their current placements, and that Jasmine and Eric's foster families were also considering adoption. The evidence was undisputed that the Children had significant behavioral issues, and were extremely difficult to deal with when they were all together. The therapist testified that the Children would "be okay" with the termination, because they would know that they were still going to be safe and cared for, and that their prognosis was good if their current placements/therapy continued.

The proof showed that Mother had shown neglect toward the Children by failing to take them to school or to their mental health appointments, by her abuse of drugs, and by her association with criminals. There was no showing that Mother's home would be healthy or safe for the Children. Mother had demonstrated such a lack of parenting ability that the Children were known to become violent with each other on her watch, had harmed themselves to get her attention, and were allowed to run off into the road at times due to her lack of boundaries. The testimony established that it had been difficult for trained foster care providers to deal with the Children as a group, and that Mother, with her lack of proper parenting abilities, would be unsuccessful in attempting to do so.

The final factor which militates heavily in favor of termination is Mother's mental/emotional status. Mother testified that she was bipolar and had a severe anxiety

disorder, which prevented her from working. Mother had recently been placed on medication for her bipolar disorder, but was not taking it regularly. Mother was taking Xanax for her anxiety disorder, but was abusing that prescription. Mother was only going for mental health appointments about once a month, and had not received the type of intensive therapy that her assessment mandated in order to deal with her mental health and substance abuse issues.

While Mother was thirty-one years of age at the time of trial, she was assessed as having the intellectual functionality of an eleven-year-old. The trial court found this assessment to be somewhat low, given Mother's testimony in court and her ability to write expressive letters to the Children, and found that her functionality was more commensurate with a person having a tenth grade education, as she did. The court still found, however, that Mother did seem to lack the ability to function properly for her age/responsibilities, even with months of training in parenting skills. Mother's assessment stated that the likelihood the Children's needs would not be met, based on Mother's "incapacity to parent," was high, and her situation was unlikely to be rectified. Various witnesses testified that they had discussed the Children's needs with Mother and had attempted to work with her to develop her skills and abilities as a parent, but Mother would not or could not put that knowledge into practice. As the trial court aptly stated from the bench, "if these mental health conditions [of Mother] are worsening now without the kids, they would certainly prevent her from being able to effectively and safely parent the Children if they came back to her because the children are, to put it mildly, a handful."

Perhaps most importantly, as the trial court found, it would simply be unjust to keep these Children in foster care limbo any longer, given the proof that Mother's ability to change or remedy her situation was unlikely. Mother had not addressed her drug abuse or mental health issues, and did not take steps to participate in the Children's therapy in any meaningful way. Mother appeared to be unable to understand or deal with her own problems, and would certainly not be able to deal with the significant behavioral and emotional problems exhibited by the Children. The Children were stable and being well cared for in their current placements, and the proof showed that a change of environment would cause appreciable regression for them. Thus, the evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that termination is in the best interest of the Children.

V.

The judgment of the trial court is affirmed. Costs on appeal are taxed to appellant, Tabitha W. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., P.J.