IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 10, 2014

**IN RE E.G.H. ET AL.**

**Appeal from the Chancery Court for Knox County**
**No. 184039-3     Michael W. Moyers, Chancellor**

_____

**No. E2014-01146-COA-R3-PT-FILED-APRIL 14, 2015**

_____

S.J. (Mother) challenges the order terminating her[1] parental rights to her minor children, E.G.H. and E.W.H. (collectively, the Children). The Children were removed from Mother's custody as a result of (1) Mother's drug use during pregnancy as well as (2) domestic violence in the home. In 2009, a year after the Children came into state custody, they were placed in the custody of an uncle, V.E.E. (Uncle), and his wife, J.G.E. (Aunt) (collectively, Petitioners). In 2012, Petitioners filed a petition seeking termination of the biological parents' rights and the adoption of the Children. Following a trial, the court found, by clear and convincing evidence, that Mother abandoned the Children by willfully failing to visit them. By the same evidentiary standard, the court determined that termination is in the Children's best interest. On this appeal, Mother challenges the sufficiency of the evidence proffered to establish a ground for termination and the trial court's best interest decision. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, S.J.

Allison J. Starnes-Anglea, Knoxville, Tennessee, for the appellees, V.E.E. and J.G.E.

---

[1]The petition was also filed against the Children's biological father, P.H (Father). The record reflects that Father's parental rights were terminated pursuant to a default judgment entered prior to trial. Father is not a party to this appeal.

Mary Lynn Mathis, Knoxville, Tennessee, guardian ad litem.[2]

## OPINION

### I.

Mother and Father were never married to each other. The couple resided in the state of Kentucky when a daughter, E.G.H., was born to them in 2008. A son, E.W.H., was born in Kentucky the following year. In the month following the birth of E.W.H., the Cabinet for Families and Children, a Kentucky state agency, took custody of the Children because of evidence that E.W.H. was born with drugs in his system and due to allegations of domestic violence in the parents' home. The Children were placed with a foster family in Kentucky.

In June 2008, a permanency plan was developed in Kentucky that required Mother to complete certain tasks supporting a return of the Children to Mother. Initially, Mother made some progress. A July 2008 progress report states that she began parenting classes, passed a drug screen, and regularly exercised visitation with the Children. However, by September 2008, Mother was having problems securing stable housing and had failed a drug screen. To her credit, she had passed two other drug screens. In August 2009, Mother gave birth to a third child. That child was also removed from her custody and Mother consented to the child's adoption. Mother said her "life was in disarray" and she found herself headed to jail.

When the Children first entered foster care, Mother was admittedly unable to get off drugs. After discussing her situation with her mother, C.J. (Grandmother),[3] Mother approached child services staff to pursue placing the Children with relatives while she focused on her problems. When Petitioners, who resided in Knoxville, learned that their niece and nephew were in foster care, they traveled to Kentucky for supervised visits with the Children. Following an April 2009 hearing, custody of the Children was transferred to Petitioners. The Children were moved to Petitioners' home in Knoxville, where they remained throughout the duration of the Tennessee proceedings. The custody order provided that visitation by Mother would be at Petitioners' discretion.

Mother, who remained in Kentucky, had no contact with the Children after they moved to Tennessee. On October 31, 2012, Petitioners filed a petition for adoption that also sought the termination of Mother's and Father's parental rights. In December 2012,

---

[2]The guardian ad litem joined in the brief filed by Petitioners.

[3]Grandmother had adopted both Mother and Uncle.

the family court in Kentucky ordered jurisdiction of the Children's case transferred to Tennessee, which had been the Children's "home state" since 2009. The Tennessee trial court held a one-day bench trial in May 2014. At that time, E.G.H. was six and E.W.H. was five.

The proof was to the effect that Mother continued to struggle with her drug addiction and other issues. Cocaine was her drug of choice. She admitted that she was not capable of caring for the Children in the 2009-2011 period. She said that she did not make earlier efforts to contact the Children because of stints in jail or time spent attending drug treatment programs. In later testimony, Mother clarified her remarks to reflect that she quit the drug rehabilitation program after 90 days and elected to return to prison and serve out her jail sentence. She conceded that she attended three drug programs in all and completed none of them. She explained, "I was tired, and when you are tired, you are just done." At the time of trial, Mother was on five years' probation as a result of a 2012 burglary conviction. She agreed she had been in "a lot of trouble" in the past, but testified that she reported monthly to her probation officer and was in compliance with the conditions of her probation.

Mother submitted that she was now ready to parent the Children. Initially, however, she sought only visitation and the opportunity to "reconnect" with the Children. She maintained that she had become "clean and sober," ended her abusive relationship with Father, and obtained her own housing. She had completed domestic violence and parenting classes, underwent an alcohol and drug assessment and attended some drug therapy sessions. Mother suffered from epilepsy and relied for her support on the social security disability benefits she began receiving in October 2013. Mother added that she was grateful to Petitioners for taking the Children into their home.

Uncle testified that from the time Petitioners took custody of the Children, they had "zero contact" with Mother for nearly three years. Mother sent no correspondence or gift to the Children and did not pay any child support to Petitioners. Uncle said that, when they filed for adoption, Mother, for the first time, began asking to see the Children.

Grandmother testified that, as recently as January 2012, Mother had said she did not want custody of the Children. She said Mother had maintained that position until the petition was filed, after which Mother suddenly changed her mind and informed Grandmother that she "wanted her kids." At the time of trial, Grandmother continued to speak to Mother regularly, but neither of them mentioned the Children anymore. Grandmother continued to reside in Knoxville and saw the Children at least several times a week. It was Grandmother's opinion that the Children should remain with Petitioners. She testified "they are secure. They are stable. They are well rounded. They are loved." Aunt added she fostered the Children's belief that she was their mother and had never discussed Mother with the Children. Aunt agreed it had been their intention to adopt the Children ever since they obtained custody. The guardian ad litem advocated in favor of

-3-

terminating Mother's parental rights and allowing the adoption by Petitioners as being in the Children's best interest.

At the conclusion of the trial, the court terminated Mother's parental rights. The court found, by clear and convincing evidence, that (1) Mother abandoned the Children by willfully failing to visit them, and (2) that termination is in the Children's best interest. Mother filed a timely notice of appeal.

## II.

Mother presents the following issues for our review, as taken verbatim from her brief:

> 1. Whether the trial court erred in finding that [Mother] willfully [failed] to visit with the minor children.
>
> 2. Whether the trial court erred in finding that termination of [Mother's] parental rights was in the best interests of the minor children.

## III.

With respect to termination of parental rights cases, this Court has observed the following in a 2011 case:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

-4-

*In re Angelica S*., E2011-00517-COA-R3-PT, 2011 WL 4553233 at \*11-12 (Tenn. Ct. App. E.S., filed Oct. 4, 2011) (citations omitted).

"As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise." *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004); Tenn. R. App. P. 13(d). Our role is to determine "whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights." *Id*. at 654. Great weight is accorded the trial court's determinations of witness credibility, which findings will not be disturbed absent clear and convincing evidence to the contrary. *See **Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. ***Langschmidt v. Langschmidt***, 81 S.W.3d 741 (Tenn. 2002).

IV.

As previously noted, the trial court terminated Mother's parental rights based upon its finding of abandonment by Mother's willful failure to visit. Pursuant to Tenn. Code Ann. § 36-1-113(g)(1) (2014), "abandonment" is among the enumerated statutory grounds upon which termination can be based. In turn, Tenn. Code Ann. § 36-1-102 (2014) further defines "abandonment," as relevant to this case, to mean that,

> [f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). In the present case, the applicable four-month period for purposes of establishing abandonment is from June 31, 2012 until October 30, 2012, the latter date being the day before the petition was filed.

At the conclusion of the proof, the trial court made, in relevant part, the following findings:

> [D]uring that period the evidence is that . . . no cards or letters were sent, no phone calls were placed to the children that were refused by [Petitioners]. The only evidence of any attempt directly . . . for a contact between [Mother] and

[Petitioners], who are the only parties who had custodial rights and decision making authority, was a series of texts that [Mother] testified occurred sometime in the summer of 2012 with [Uncle]. [Mother] testified that . . . [Uncle's] response was . . . not good, and she dropped it and let it go. [Uncle] did not testify that this conversation took place, and no records of this text exchange have been introduced . . . to allow the Court to judge the credibility of the parties or whether this exchange, in fact, took place.

The Court notes not only are those records missing, but [Mother], if she is to be believed after three to four years of silence, now suddenly seeking to visit with these children and having been rebuffed by [Uncle][,] took no steps in Tennessee or in Kentucky to seek court intervention to allow her visitation with the children. The original order said that visitation would be at the discretion of [Petitioners], but there's nothing that indicates that [Mother] couldn't have gone back to Court and said, look, I've tried to visit with my children, and they are unreasonably withholding visitation. . . She took no such steps.

[T]he only evidence that any such conversation took place is [Mother's] own testimony uncorroborated by the testimony of any other witness or by documentation. The only other evidence of any contact between [Mother] and any party related to these children is the phone conversation between the grandmother and [Mother] in which it was alleged that [Petitioners] were concerned that if [Mother] came down at Thanksgiving and visited with them, that she might take the children, try to kidnap the children. [T]his is of little use to the Court because we know that this action was filed in late October. The grandmother testified that the conversation in question took place a couple of weeks before Thanksgiving, and that would have put it around the time that the petition was filed. [I]n any event, a conversation with the grandmother who had no custodial rights and no decision making over [these children] can hardly be seen as a serious attempt by [Mother] to visit with the children.

[Mother] has had . . . from April 2009 . . . through October of 2012 even to send a birthday card, even to send a birthday card, and she excuses that failure by saying she didn't know

-6-

the address.  The address is in the file.  It's right there in the file where their address is.  Their address hasn't changed.

On top of that, I asked the grandmother if at any point [Mother] had asked for and been refused the address of [Petitioners].  She testified that . . . had not been asked for. [Mother] easily could have discovered the mailing address of [Petitioners].  It wasn't a priority for her. The testimony we had and her conversation with the grandmother was in watching some children play, [Mother] testified that she couldn't do that.  She couldn't parent the children, and that she didn't want them anymore.  The last minute attempts to change that situation when it has become apparent that your rights may not be terminated aren't enough.

Mother does not dispute that she failed to visit the Children, but argues that her admitted lack of contact cannot be deemed "willful."  She contends that, "in the beginning," she was not capable of visiting and later, her efforts were actively thwarted by Petitioners and dissuaded by Grandmother.  "To prove the ground of abandonment, a petitioner must establish by clear and convincing evidence that a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013)(citing *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005)).  Further, "[a] parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control."  *Id*. (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007).

At trial, Mother admitted she had not visited and had no other form of contact with the Children since they went to live with Petitioners some five years earlier.  She took the position that there was "no way" she could contact them during 2009, 2010, and 2011 because she was either in jail or attempting to become "clean" through drug rehabilitation.  Mother said she first attempted to make contact with the Children by contacting Grandmother in the summer of 2012.  According to Mother, she hadn't received a petition or any paperwork as of that time, so she called Grandmother to tell her she wanted the Children back.  Mother said Grandmother advised her to "leave them where they were," so Mother "just left it alone."  Mother said that sometime later, she sent a text to Uncle about seeing the Children and he responded by asking her "why I was doing this to him after it's been so long and that was about the extent of that."  Mother said Uncle indicated he was unwilling to allow visitation and planned to hire a lawyer to fight her.  Mother offered no evidence, save her oral testimony, of the alleged text message exchange.  Mother admitted she never sent any gifts or letters to the Children, but said she never had Uncle's address.  She stated that she never asked Grandmother for Uncle's address because she did not believe Grandmother would give it to her.

In January 2012, Uncle was working in Kentucky. Coincidentally, Grandmother had also traveled to Kentucky to visit Mother, and the three had dinner together. Uncle testified that it was the first time he had contact with Mother since taking custody of the Children. According to Uncle, Mother told him, regarding the Children, words to the effect that "she knows that they are not hers now, and that they are at a good place, and they were both better off where they are. . . ." According to Uncle, he did not speak with Mother again until September 2012, when he obtained her phone number from Grandmother and called Mother to let her know the petition was forthcoming. Mother called Uncle a few times before the petition was filed, but never asked about the Children. Once, she called to ask for money to buy medication for her epilepsy. Uncle gave her the money she requested. The next time Uncle heard from Mother was just after she was served with the petition.

For her part, Grandmother recalled that during their dinner, Mother said "she was happy with life; that she didn't want the [C]hildren anymore." Grandmother testified that Mother seemed content and even planned to come to Grandmother's home to join the family for Thanksgiving. In November, however, Grandmother was "shocked" to receive a text message from Mother; she testified that "all of a sudden it was, I want my children back." Grandmother said it was the first time Mother had ever mentioned wanting to see the Children. Grandmother admitted that she told Mother it was not a good idea because they did not know Mother as a parent and she was "tearing the family apart" with her sudden change of course. Grandmother admitted that she related to Mother that Petitioners became uncomfortable with including Mother in the holiday plans because they were afraid she was irrational and might try to take the Children away. Lastly, Grandmother testified that she personally gave Uncle's phone number to Mother as far back as 2010.

We conclude that the evidence at trial does not preponderate against the court's determination that abandonment by failure to visit has been clearly and convincingly established. Mother admittedly had no contact with the Children in the critical four months before the petition was filed. Further, we think her failure to have such contact must be considered to be willful. If Mother's uncorroborated testimony is to be believed, her text message exchange with Uncle sometime during the summer of 2012 was the only time she sought visitation before the petition was filed. Mother admittedly dropped the matter when Uncle was not receptive to visits. In our view, such testimony, even if true, does not excuse Mother's failure to visit, nor, on the other hand, does it amount to an active effort by Petitioners to prevent Mother from seeing the Children. Stated another way, we think that something more than a single text exchange was required to establish a lack of willfulness in this case. To that end, Mother's further testimony that she never traveled to Knoxville to see the Children because she did not get along with her family members, "nobody would talk" to her, and she did not have Petitioners' address is equally unpersuasive. As the trial court noted, Petitioners' address never changed and it

was documented in the Children's case file in Kentucky and available to Mother since at least 2009.

Additionally, we note that Mother's "proof" consisted of her conversations with Grandmother, who testified that she was "shocked" to hear that Mother wanted to see the Children, for the first time, weeks after the petition had already been filed. The law expressly provides, however, that "[a]bandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child." Tenn. Code Ann. § 36-1-102(f). In addition to having no face-to-face visits, Mother conceded she had not sent gifts or cards or otherwise attempted any contact with the Children during the relevant four-month period or in the years since the Children left Kentucky. In summary, the evidence shows that Mother had nothing to do with the Children for years and, as the trial court implicitly found, her meager efforts to begin a relationship once termination was a real possibility were "too little, too late."

The evidence does not preponderate against the trial court's findings. The trial court did not err in terminating Mother's parental rights on the ground of abandonment by willful failure to visit.

V.

Having affirmed the trial court's finding of a ground for termination, we turn to the issue of the Children's best interest. As we have noted, before terminating a parent's rights, a court must determine that two things have been clearly and convincingly proven —"not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). We are guided on our review by the list of non-exclusive factors enumerated in Tenn. Code Ann. § 36-1-113(i).[4] In the case at bar, the trial court

---

[4]The statute provides that "[i]n determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following":

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(continued…)

expressly considered each of the statutory factors and concluded that most – particularly factors three, four, five, six, and nine – weighed in favor of termination. Generally summarized, as to these factors, the trial court found that Mother "maintained no visitation and no contact" with the Children; there was such a lack of a meaningful relationship that the Children would not be able to pick Mother out of a lineup; Petitioners were the only "parents" the Children had ever known; a change of caretakers would conflict with the goal of creating permanency in their lives; the Children had been removed from Mother's custody because she had acted with neglect and/or abuse toward them; and Mother had not consistently paid child support.

The trial court found "as a matter of fact and law that it is in the best interest of these children, that [Mother's] rights to the children be terminated and that an action proceed to allow [Petitioners] to adopt these children." The evidence does not preponderate against the trial court's findings. The court credited Mother with making recent strides to improve herself – at the time of trial, (1) she continued to pass random screens and comply with the other conditions of her probation, (2) she had obtained housing, (3) she obtained disability benefits for her epilepsy and her seizures were being medically managed, and (4) she had completed permanency plan tasks including parenting and domestic violence classes and a drug and alcohol assessment. Mother's progress aside, we must view the question of what is best for the Children from their perspective rather than Mother's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

---

(continued…)

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In the end, the trial court "sadly and reluctantly" found that termination best serves the Children's interest given that,

> [Petitioners] are the only real parents these children have ever known, given that they both work, that they provide a stable home for these children, that there's been no evidence introduced that the children are doing poorly or are having any difficulty in their care, given that it would be substantially disruptive of their lives to be rooted up and . . . introduced to a new person for the first time that they can remember . . . to . . . somebody who's their actual parent, given the recency of [Mother's] efforts to rehabilitate herself and the inability of this Court to judge whether in the long term those efforts will be successful in the interest of providing permanency in the lives of these children so that they can grow and prosper. . . .

We agree with the trial court's analysis and conclusion. The proof shows that, for years, Mother was seemingly content to allow Petitioners to raise the Children with no involvement from her whatsoever until Petitioners decided to initiate adoption proceedings. Only then did Mother express a renewed interest in being a parent. By then, however, the Children had been welcomed into a safe, stable home with loving care provided by the only "parents" the Children had ever known. Furthermore, at the time of trial, Mother wanted only to visit and "reconnect" with the Children, but was not yet seeking custody.

In summary, clear and convincing evidence exists to show that severing Mother's ties to the Children and thereby allowing them an opportunity at permanency is in their best interest. We therefore affirm the trial court's best interest determination.

VI.

The judgment of the trial court terminating Mother's parental rights to the Children, E.G.H. and E.W.H., is affirmed. Costs on appeal are taxed to the appellant, S.J.

This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE