IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 3, 2020

**IN RE LIJAH D. ET AL.**

**Appeal from the Juvenile Court for Bradley County**
**No. V-18-181        Lawrence Howard Puckett, Judge**

_____

**No. E2019-02297-COA-R3-PT**

_____

This appeal arises from the trial court's finding that grounds exist for terminating a mother and father's parental rights to four children, and its finding that termination is in the children's best interest. In this appeal, the parents contest only the best-interest determination. They contend termination was not in the children's best interests because, *inter alia*, the Department of Children's Services failed to use "reasonable efforts" to help them make a lasting adjustment to their circumstances. We affirm the trial court's determination that the grounds of severe abuse and persistent conditions were proven and that termination of the parents' rights is in the children's best interest. Accordingly, we affirm the termination of both the mother and the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which JOHN W. MCCLARTY and ARNOLD B. GOLDIN, JJ., joined.

Wilton A. Marble, Jr., Cleveland, Tennessee, for the minor children, Gabriel S. D., Lijah M. D., Lucien X. D., and Zabreakiel K. D.[1]

Berry Foster, Chattanooga, Tennessee, for the appellant, Daniel J. D.

Chessia Allyn Cox, Athens, Tennessee, for the appellant, Hannah R. J.

Andrée Kahn Blumstein, Solicitor General; Kathryn A. Baker, Senior Assistant Attorney General; and Jordan Keith Crews, Assistant Attorney General, Nashville, Tennessee, for

---

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

the appellee, Tennessee Department of Children's Services.

## OPINION

### FACTS AND PROCEDURAL HISTORY

### I. Background

This case concerns the parental rights of Daniel D. ("Father") and Hannah J. ("Mother") to their children: Lijah, born in 2009; Lucien, born in 2012; Gabriel, born in 2013; and Zabreakiel, born in 2014 (collectively, "the Children"). Mother gave birth to a fifth child, Collwynn D., in October 2018; however, Parents' rights to Collwynn are not at issue in this appeal.

In June 2015, the Department of Children's Services ("DCS") took custody of the Children after law enforcement arrested Mother and Father (collectively, "Parents") for child neglect. The next day, DCS filed a petition in the Bradley County Juvenile Court, alleging that the Children were dependent and neglected. After a hair follicle test on Zabreakiel D. came back positive for hydrocodone and oxycodone, DCS amended the petition to add a claim of severe child abuse.

Initially, DCS placed the Children in three foster homes in Middle Tennessee: Lijah in one; Lucien and Gabriel in another; and Zabreakiel in a third. During this time, DCS facilitated regular visitation for Parents by driving the Children to visit them in East Tennessee.[2]

In July 2015, DCS developed the first of three permanency plans with Parents. Each plan had identical responsibilities for Parents, including: (1) obtain and follow the recommendations of drug and alcohol assessments; (2) refrain from taking medications without a prescription; (3) stay free from new criminal charges; (4) provide proof of transportation and income; (5) provide proof of and maintain safe, appropriate housing; and (6) submit to random drug tests.

In June 2016, the Bradley County Juvenile Court ruled on DCS's dependency and neglect claim. The court concluded that the Children were dependent and neglected because Mother and Father "were unable to provide a safe and stable home due to drug use." The juvenile court based its determination on these findings of fact:

> Investigator Brittany Olenick went to the home on May 11, 2015, and both
> parents tested positive for oxycodone. [F]ather advised that he had a

---

[2] DCS social worker, Stephanie Gayle, testified that she drove the Children two hours each way twice a month to see Parents.

prescription. [M]other does not have a valid prescription for opiates[;] she claimed that she took one of [F]ather's pills and that it was a one-time event. [M]other advised that she was breastfeeding the infant. She was arrested on that date on an outstanding warrant. Investigator Olenick requested verification of [F]ather's prescription, but he was unable to provide any documentation to [DCS], including the pill bottle that he claimed was empty and was lost. There were environmental concerns at the home, and Investigator Olenick requested that [P]arents clean the home and make it safe and appropriate for the [C]hildren.

On May 18, 2015, Investigator Olenick went back out to the home and found that the condition of the home had improved. [P]arents still were unable to show proof of any valid prescriptions. . . .

Investigator Olenick attempted to meet with [P]arents again, but [she] was unable to find them at their home until June 11, 2015. Upon approaching the home, Investigator Olenick noticed that [M]other was wandering down the street approximately a block away from the house and Investigator Olenick called for police assistance. [M]other appeared to be under the influence. When Investigator Olenick arrived at the home with law enforcement she found [M]other back in the home with the [C]hildren, however there were no other adults in the home. The [C]hildren are all under the age of six and were left unsupervised in the home.

The home was observed to be in deplorable condition with multiple safety hazards . . . . The home smelled of feces, with many flies and the home was not air conditioned. The toilets were clogged with feces and the home was scattered with trash, clothes, old food, and other various items.

[P]arents were drug tested again. [F]ather was positive for oxycodone and [M]other was positive for oxycodone and marijuana. [F]ather stated he had a prescription and [M]other does not have a prescription. [M]other stated that [F]ather snorts his pills. There were multiple empty pill bottles around the home, all prescribed in small amounts to [F]ather from various different pharmacies and different prescribers. [M]other stated that she had taken one of her husband's pills two days prior.

The child, Zabrekiel [D.], submitted to a hair follicle drug screen on June 18, 2015, and tested positive for hydrocodone and oxycodone. He is seven months old. [P]arents also submitted to a hair follicle drug test on June 22, 2015, [and] both parents tested positive for hydrocodone and oxycodone. [M]other does not have a prescription for opiates and [F]ather has failed to produce a valid prescription for either narcotic.

The juvenile court also found that Mother and Father complied only partially with the permanency plans:

> . . . [M]other and [F]ather have both completed parenting classes. [M]other reports that she receives [social security checks] but has produced no proof. [F]ather does not have income at this time, however, he does have an upcoming hearing for his own disability claim. Barriers to reunification exist in that [P]arents reside in a home with insufficient space for the four children; [P]arents have provided [DCS] with no transportation plan; and [M]other has not completed a mental health assessment.
>
> DCS and/or its agents have provided the family with visitation for the [C]hildren, by transporting the [C]hildren from the foster home to Cleveland, TN; has provided sibling visits for the [C]hildren; and has provided the [P]arents with resources to complete the steps on their permanency plan. These efforts constitute reasonable efforts by the state to reunify the family and/or provide the [C]hildren permanency and to prevent the [C]hildren from continuing in foster care unnecessarily.

Two months later, the juvenile court entered a second order, finding Zabreakiel was a victim of severe child abuse. The court based its decision on the facts that Mother had knowingly exposed Zabreakiel to drugs and that Father knowingly failed to protect him. No appeal was taken from the final order finding Parents committed severe child abuse.

In July 2016, DCS placed Lijah and Zabreakiel with their maternal grandmother, Christina D. ("Grandmother") in South Carolina. Lucien and Gabe joined their brothers in March 2017. Parents visited the Children in South Carolina once with the help of DCS,[3] and they had three scheduled phone calls per week.

In the fall of 2016, Father qualified for social security disability benefits. Initially, Father received a lump-sum payment of $8,000 for backpay. Thereafter, Father received regular payments of $862 per month.[4] With the funds, Father purchased a vehicle and rented a one-bedroom trailer home. However, when DCS social worker, Stephanie Gayle, visited the home, the only furniture was an inflatable mattress in the living room. Additionally, Father revealed that he no longer had transportation because his vehicle broke down. Father also tested positive for morphine and could not provide evidence of a valid prescription.

---

[3] DCS provided a prepaid gas card to Parents for the trip.

[4] Among other health issues, Father had problems with his back that required several surgeries in 2016.

- 4 -

Parents' living circumstances did not improve over the following months, and in March 2018, Ms. Gayle discovered that Mother was living in Nashville without transportation. Around the same time, both Mother and Father refused to take a drug screen.

## II. Termination Proceedings

In April 2018, DCS filed a petition to terminate Parents' rights in the Bradley County Circuit Court.[5] Grounds for termination included severe child abuse, based on the juvenile court's adjudication, and persistent conditions, based on Parents' lack of adequate housing and alleged drug abuse.[6] DCS asserted that termination of Parents' rights was in the Children's best interests for several reasons: (1) Parents remained without adequate housing and transportation; (2) Parents either failed or refused drug tests and never attended drug treatment; (3) Parents failed to address mental health concerns; (5) the Children were thriving in their placement with Grandmother; and (6) Parents had not paid child support.

The case was tried over two days in February and October 2019.[7] Mother, Father, Grandmother and Ms. Gayle testified at trial. Mother and Father stated that they were homeless and without transportation, and Mother testified that she was living "in the woods" and had no income. Mother stayed with Father at the trailer for a few months in 2018. Father, however, had to give up the trailer in July of that year due to mold. Mother then stayed with friends, but she lost that housing when her friends moved.

Although Mother had been receiving social security benefits, she testified that the payments were "messed up" and had ceased. Mother explained that she received the benefits because of a legal disability, which she described as dyslexia. Mother admitted

---

[5] The petition at issue in this appeal is the second petition DCS filed to terminate Parents' rights. In October 2016, DCS filed its first petition to terminate Mother and Father's parental rights in the Bradley County Juvenile Court. The court, however, denied that petition after a hearing in April 2017. Although the juvenile court found clear and convincing evidence of more than one ground for terminating Mother and Father's rights, it determined that the evidence did not clearly and convincingly show termination was in the Children's best interests. No appeal was taken from that order.

[6] DCS originally asserted four grounds, but it struck two of them at trial, and those grounds are not at issue in this appeal.

[7] The court's final order reveals that the case was set for trial and continued on several occasions, but evidentiary hearings occurred only on February 27, 2019 and October 31, 2019:

> This cause came to be heard on September 10, 2018, February 27, 2019, July 15, 2019, and October 31, 2019. . . . The September 10, 2018 hearing resulted in a continuance due to the unavailability of [G]randmother as a witness, and the July 15, 2019 hearing resulted in a continuance due to [F]ather's medical issues, with no testimony or evidence presented on those dates beyond brief statements of counsel related to those issues.

that she had a "problem" with oxycodone in 2015 and never sought treatment. Mother also testified that she was presently taking oxycodone with a prescription.

Ms. Gayle, the DCS social worker, testified that Mother tested positive for oxycodone in early 2019 and could not prove that she had a valid prescription. Around the same time, Mother completed a drug and alcohol assessment and received a recommendation to attend counseling. Although a drug test on Father was positive for oxycodone, he had a prescription. His assessment included no recommendations for additional action. However, Father's transportation plan was rejected by DCS because it relied on a friend who was a registered sex offender.

Grandmother testified that she moved with the Children to Florida in July 2018 to be closer to her ailing mother, the Children's great-grandmother. Ms. Gayle also testified that Mother requested assistance to get a vehicle and to find housing in Florida after the Children moved so she could be closer to them. Ms. Gayle denied the request for a vehicle because Mother had no driver's license and did not know how to drive. As for housing, Ms. Gayle recommended Mother reside in a domestic-abuse shelter in Florida because Mother and Father had a history of domestic abuse, some of which occurred in the presence of the Children. She also provided information to assist Mother, but Mother never responded to or acted upon the housing recommendation.

As for the Children, Grandmother stated that she regularly took the eldest three to therapy. Grandmother was continuing to do so with Lijah and Gabriel even after DCS sent Lucien to Tennessee for treatment in December 2018, when his behavioral issues worsened. Grandmother further explained that the Children were progressing well in their education and developing relationships with friends and extended family members.[8] Grandmother also testified that she was ready and willing to adopt the Children.

On December 2, 2019, the circuit court entered an order terminating the parental rights of both Mother and Father. The court found DCS proved the ground of severe child abuse due to the prior adjudication in juvenile court. The circuit court also concluded that DCS proved the ground of persistence of conditions because neither Mother nor Father had obtained stable and proper housing in the four years since the Children's removal. Due to the length of time, the court concluded that Parents were unlikely to remedy the lack of safe, stable housing at an early date. The court also noted that the Children had bonded with Grandmother, who was meeting their needs and willing to adopt all of them.

---

[8] The record does not clearly establish whether or when Lucien returned to reside with Grandmother in Florida. At the October 2019 hearing, Ms. Gayle testified that Lucien had completed his treatment and "stepped down to a foster home" in Tennessee. She also stated that DCS would return Lucien to Florida to live with Grandmother and his siblings "if he can maintain his behavior in the foster home."

The trial court recognized that Parents initially maintained regular contact with the Children through in-person visits and, more recently, through phone calls. The trial court also found that Parents had a meaningful relationship with the three older children but not Zabreakiel, who was only 18 months old when DCS removed him. Nevertheless, the court determined that termination was in the Children's best interests because, *inter alia*, both Mother and Father had shown abuse and neglect toward the Children, had failed to make an adjustment of circumstances, and were unlikely to make an adjustment any time soon. The court also noted that Mother never paid child support, and Father had not done so since 2016. The court concluded that the evidence showed Parents were "unable to take care of themselves, much less able to take care of the [C]hildren." Moreover, the court found a change of caretakers and physical environment was likely to harm the Children because they were living in a stable environment with Grandmother, and Parents' could not meet Lucien's mental health needs.

The court also concluded that Mother's mental status would be harmful to the Children based on her demeanor:

> As to whether [P]arents' mental and/or emotional status would be detrimental to the children or prevent them from effectively providing safe and stable care and supervision for the children, the Court finds this to be the case as to [M]other, due to that fact that she presented as being less than fully alert during her testimony. The Court credits [M]other's explanation that she had been up until 4:00 am on the night before the final day of trial when she testified, but it appeared to the court that she may have been under the influence of some sort of medicine/substance. However, there was no testimony or evidence that called into question [F]ather's mental and/or emotional status, and his presentation during his testimony gave the Court no cause for concern in this regard. Therefore, the Court finds that this factor weighs in favor of termination of [M]other's parental rights to the children, but that it weighs against termination of [F]ather's parental rights to the children.

Based on the foregoing, the trial court found that DCS had proven by clear and convincing evidence that termination of Parents' parental rights was in the Children's best interest. Because grounds for termination had also been proven, the court terminated Mother and Father's parental rights. This appeal followed.

**ISSUES**

Mother and Father present only one issue on appeal. Each contends the evidence did not clearly and convincingly prove that termination of their parental rights was in the Children's best interests.

STANDARD OF REVIEW

"To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable, . . . eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence," and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted).

We review a trial court's findings of fact de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). However, the heightened burden of proof in termination proceedings requires this court to make its own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). A trial court's ruling regarding whether the evidence sufficiently supports termination is a conclusion of law, which we review de novo with no presumption of correctness. *See id*.

## ANALYSIS

### I. Grounds for Termination

Parents concede that DCS proved two grounds for terminating their parental rights: (1) severe child abuse and (2) persistence of conditions. *See* Tenn. Code Ann. § 36-1-113(g)(3) to (4). Nevertheless, we "must review the trial court's findings as to each ground for termination . . . , regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525–26.

### A. Severe Child Abuse

Under Tenn. Code Ann. § 36-1-113(g)(4), a ground exists for terminating a parent's rights if the parent "has been found to have committed severe child abuse as defined in § 37-1-102, **under any prior order of a court**." (Emphasis added). The order need not "have any specific temporal proximity or nexus to the current child at issue or the proceedings currently being adjudicated." *In re I.E.A.*, 511 S.W.3d 507, 516 (Tenn. Ct. App. 2016).

The Bradley County Juvenile Court found both Mother and Father committed severe child abuse. Neither appealed that decision. Thus, we affirm the trial court's determination that DCS proved the ground of severe child abuse under Tenn. Code Ann. § 36-1-113(g)(4).

## B. Persistent Conditions

To prove the ground for termination in Tenn. Code Ann. § 36-1-113(g)(3),[9] a petitioner must show (1) the child has been removed from the parents' home for six months or more by a court order, (2) conditions exist "that in all reasonable probability, would cause the child to be subjected to further abuse or neglect," (3) "[t]here is little likelihood that these conditions will be remedied at an early date," and (4) "[t]he continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home." The purpose of this ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008).

The juvenile court placed the Children in DCS custody in June 2015 due to, *inter alia*, Parents' inability to provide a safe home environment. Over four years later, the Children were still in DCS custody, both Mother and Father were homeless, and Grandmother wanted to adopt the Children.

Based on the foregoing and additional facts in the record, we affirm the trial court's determination that DCS proved the ground of persistent conditions under Tenn. Code Ann. § 36-1-113(g)(3).

## II. Best Interests

Having found the existence of grounds for terminating Parents' rights, we must next consider whether doing so was in the Children's best interests. *See* Tenn. Code Ann. § 36-1-113(c); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When deciding whether termination of parental rights is in a child's best interest, a court's analysis includes but is not limited to consideration of:

(1)    Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)    Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services

---

[9] The Tennessee General Assembly amended Tenn. Code Ann. § 36-1-113(g)(3) in 2018. *See* Act of May 3, 2018, Tenn. Pub. Acts ch. 875, § 2 (effective July 1, 2018.) The changes are immaterial to this case.

agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

Parents concede that the juvenile court found they neglected the Children in 2015, and Parents admit they did not change their circumstances to make it safe for the Children to return. Parents also admit they did not pay child support. However, Parents contend the trial court erred by giving weight to these facts because DCS did not use "reasonable efforts" to assist them. Parents also point out that they had regular contact with all four of the Children, and they had meaningful relationships with the three oldest. Relatedly, both Mother and Father argue that DCS failed to prove a change in caretakers would be detrimental to the Children, and Mother contends DCS presented insufficient evidence that her mental or emotional condition would be detrimental to the Children.

We respectfully disagree that evidence of DCS's efforts to help Parents—or the lack of it—undermines the significance of the trial court's finding that Parents failed to create a safe home for the Children for over four years. In the best-interest analysis, consideration of DCS's efforts to assist with making the parent's home safe is limited to one best-interest factor. *See In re Kaliyah S.*, 455 S.W.3d 533, 553 (Tenn. 2015). That factor, found in § 36-1-113(i)(2), "directs courts to consider whether the parent 'has failed to effect a lasting adjustment *after reasonable efforts*' have been made." *Id.* (emphasis in original) (quoting Tenn. Code Ann. § 36-1-113(i)(2)). "Reasonable efforts" refers to the extent that DCS employees used "their superior insight and training to assist parents with the problems [DCS] has identified in the permanency plan." *Id.* at 556 (quoting *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004)).

Although the trial court found the factor in § 36-1-113(i)(2) supported termination, it made no findings on the reasonableness of DCS's efforts to assist Parents. Further, DCS stops short of asserting that it made reasonable efforts after the August 2016 severe-child-abuse order. Citing to Tenn. Code Ann. § 37-1-166, DCS contends the August 2016 adjudication relieved it of the responsibility to try to reunify the family. We agree because a finding of severe child abuse absolves DCS of any failure to make "reasonable efforts" to reunify the family. *See id.* Thus, Parents cannot rely on this factor to mitigate the court's other findings.

Even if DCS still had a duty to provide reasonable efforts, its failure to do so does not undermine the trial court's finding that several factors establish that termination of Parents' parental rights is in the Children's best interests. *See In re Kaliyah S.*, 455 S.W.3d at 556 (stating that the extent of DCS's efforts is "not an essential element that must be proven in order to terminate the parental rights of the respondent parent."). While "the consideration of one factor may very well dictate the outcome of the [best-interest] analysis," *White*, 171 S.W.3d at 194, that is not the case here.

The next factor disputed by Parents is the effect on the Children of a change in caretakers. Both Mother and Father argue that DCS provided insufficient evidence on this factor. We disagree. The court relied on its findings that Grandmother provided the Children with a stable home and was still doing so for Lijah, Gabriel, and Zabreakiel. The court also found Lucien's needs were being met by his foster family in Tennessee. The testimony of Grandmother and Ms. Gayle supports these findings. Contrary to Father's position, it was not necessary for DCS to present testimony from the social workers in South Carolina or Florida. Evidence that a child is in a stable home and is bonded with the foster parents is sufficient to support a finding on this ground. *See In re Adoption of D.P.E.*, 271 S.W.3d 670, 672–73 and 680 (Tenn. Ct. App. 2008) (affirming finding that severing the bond between the child and his foster parents would be traumatic based, in part, on the testimony of the foster parents).

That said, we agree there is insufficient evidence to support the court's conclusion that Mother's mental or emotional health would be detrimental to the Children. The court

relied on its own observation of Mother's demeanor on the day of the trial, which the court described as "less than fully alert." This led the court to conclude that Mother may have been under the influence of drugs. The only evidence in the record about Mother's mental health was (1) the testimony of Grandmother, who stated that Mother attended therapy as a teenager and was diagnosed with a condition similar to bipolar disorder and (2) Ms. Gayle's testimony that Mother's 2019 alcohol and drug assessment included a recommendation for counseling. Mother's delay in obtaining an assessment relates to whether she was trying to remedy the conditions that led to the Children's removal. *See In re Morgan K.*, No. M2018-00040-COA-R3-PT, 2018 WL 5733291, at *17 (Tenn. Ct. App. Oct. 31, 2018) (concluding that the father's refusal to submit to drug screens and lack of a long-term plan supported a finding under Tenn. Code Ann. § 36-1-113(i)(1)). However, the evidence preponderates against the finding that Mother's "mental and/or emotional status would be detrimental to the [Children] or prevent [Mother] from effectively providing safe and stable care and supervision for the [Children]." *See* Tenn. Code Ann. § 36-1-113(i)(8).

In summary, the Children had been in foster care for over four years by the time of the trial. Meanwhile, neither Mother nor Father kept a home that would be safe and appropriate for the Children. Mother admitted that she was living "in the woods," and Father testified that he was staying in a motel, and neither parent had transportation. Mother never paid child support; she had not been employed since 2012 and was no longer receiving social security benefits. Although Father was still receiving disability income, he had not paid child support since 2016. As the trial court aptly concluded, Parents could not take care of themselves, much less the Children.

Moreover, Parents' compliance with the permanency plan requirements was inconsistent. All three plans required Parents to, *inter alia*, submit to mental health assessments and not take medication not prescribed to them. However, Mother failed to have a mental health assessment completed until 2019, and both parents tested positive for prescription opiates when they could not produce evidence of a valid prescription. Meanwhile, the Children lingered in foster care.

The facts considered in a best-interest analysis "must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) (citations omitted). By the final hearing, three of the Children lived together with Grandmother, and Lucien was awaiting approval to return. The Children were close to several extended family members and developing friendships with other children in the community. Additionally, Grandmother was providing for their social, emotional, and academic needs, and she was ready and willing to adopt them.

The preponderance of the evidence supports the trial court's findings of fact, which clearly and convincingly establish that termination of Parents' parental rights is in the Children's best interests. Considering the foregoing, we affirm the trial court's decision to terminate Mother and Father's parental rights.

**IN CONCLUSION**

We affirm the judgment of the trial court and remand this matter with costs of appeal assessed against the appellants, Daniel D. and Hannah J., jointly and severally.

_____
FRANK G. CLEMENT JR., P.J., M.S.